Buchan *v.* Sumner.

## BUCHAN *vs.* SUMNER and others.

Previous to the revised statutes, a judgment in a court of record, in this state, was a lien upon the lands of the judgment debtor from the time of the entry thereof; whether docketed or not. But if the judgment was not properly docketed, it did not affect the lands of the judgment debtor, as against subsequent purchasers or mortgagees.

But even as to them, the undocketed judgment was entitled to priority in equity, if the purchaser or mortgagee had notice of its existence at the time of his purchase, or when he took his mortgage.

And the first judgment was entitled to a preference, although not docketed, over the lien of a junior judgment which had been docketed. But if the land of the debtor had been sold by the sheriff, under an execution upon the junior judgment, to a purchaser who had no notice of the prior judgment, such purchaser took the land discharged of the lien of the elder judgment.

But under the revised statutes, no judgment will affect any lands, tenements, real estate, or chattels real, or have any preference as against other judgment creditors, until the record thereof has been filed and docketed.

The effect of the new provisions of the statute, is to prevent the common law lien of the judgment from attaching at all upon the real estate of the judgment debtor until the judgment has been actually docketed; and not merely to protect bona fide purchasers and incumbrancers who had no notice of the existence of the judgment when their interest in, or liens upon, the real estate of the judgment

Buchan *v.* Sumner.

debtor accrued. And the provisions of the act of May 14, 1840, on this subject, are also in accordance with this construction of the revised statutes.

The court of chancery may enforce an equitable lien, either upon a legal, or upon an equitable estate in lands.

And where the common law, or a statute, creates a lien upon a legal interest in land, the court of chancery, by analogy, sometimes declares and enforces a similar lien upon an equitable estate therein.

But where the lien is created by statute, and the lien itself, as well as the estate against which it is sought to be enforced, is purely legal, chancery is not authorized to extend the lien to cases not provided for by the statute.

The fact that an error, which occurred in the docketing of a judgment, was the error of the clerk, and not the fault of the judgment creditor, or of his attorney, will not authorize the court of chancery to interfere, to deprive another judgment creditor of his legal priority, if he has obtained one, by such error.

Although the statute respecting the docketing of judgments does not declare, in express terms, that the judgment shall be entered by the clerk, in the alphabetical docket, under the letter corresponding with the surname of the judgment debtor, yet such has been the practical construction which has been given to the statute for more than a quarter of a century; and it is the only sensible construction which can be given to it. It was accordingly

*Held,* that the docketing of a judgment against P. S., under the letter P., the initial letter of his christian name, instead of the letter S., the initial letter of his surname, was not even a substantial compliance with the requirements of the statute.

It is a settled principle of the law of partnership, that the partnership effects are to be first applied to the payment of the debts of the firm, and to equalize the claims upon the different copartners in relation to the fund. In other words, the separate estate or interest of a copartner in any of the copartnership property, is only his share of that part of the copartnership effects, or of the proceeds thereof, which remains, after the debts of the firm and the demands of his copartners, as such, are satisfied.

And if one of the copartners has paid more than his share of the partnership debts, he has a claim upon the partnership property, which in equity is paramount to the claims of the separate creditors of his copartner.

Where real estate is conveyed to copartners, in their individual names, for the use and benefit of the firm, or is so conveyed to them in payment of debts due to the partnership, the legal title vests in the grantees thereof, as in an ordinary conveyance of real estate. And, by the common law, where land was purchased with copartnership funds, for copartnership purposes, and was conveyed to all the partners, generally, in fee, it would, at law, create a joint tenancy; so that neither could convey any more than his share of the land, during the lives of his copartners. And upon the death of either of the copartners, without having severed the joint tenancy by a conveyance, the legal title to the whole of the land would survive to the other copartners.

But under the statutes of New-York relative to joint tenancies, the several copartners, to whom such a conveyance was made, would become tenants in common of the legal title. And upon the death of either, the undivided portion of the legal title,

Buchan *v.* Sumner.

thus vested in the deceased partner, would descend to his heirs at law; without reference to the equitable rights of the several partners, in the land, as a part of the property of the firm.

And a bona fide purchaser, or mortgagee, who obtains the legal title to partnership lands, or to an undivided portion thereof, from the person who holds such legal title, and without notice of the equitable rights of others in the property, as a part of the funds of the copartnership, is entitled to protection in courts of equity, as well as in courts of law.

Where real estate is purchased with partnership funds, for the use of the firm, and without any intention of withdrawing the funds from the firm for the use of all or any of the members thereof as individuals, such real estate in England is considered and treated, in equity, as the property of the members of the firm collectively; and as liable to all the equitable rights of the partners, as between themselves. And for this purpose the holders of the legal title are considered, in equity, as the mere trustees of those who are beneficially interested in the fund; not only during the existence of the copartnership, but also upon the dissolution thereof.

It is the general rule, in England, that real estate belonging to a copartnership, unless there is something in the partnership articles to give it a different direction, is to be considered in equity as personal property; and upon the death of one of the copartners, and after the debts of the firm have been paid, and the equities have been adjusted between the several members of the firm, it goes to the personal representatives of the deceased partner, and not to his heirs.

The American decisions, in respect to real estate purchased with partnership funds, or for the use of the firm, establish two principles: *First,* that such real estate is in equity chargeable with the debts of the copartnership, and with any balance which may be due from one copartner to another, upon the winding up of the affairs of the firm; *Secondly,* that, as between the personal representatives and the heirs at law of a deceased partner, his share of the surplus of the real estate of the copartnership, which remains after paying the debts of the copartnership, and adjusting all the equitable claims of the different members of the firm as between themselves, is to be considered and treated as real estate.

Although a court of equity considers and treats real property as a part of the stock of the firm, it leaves the legal title undisturbed, in this state, except so far as is necessary to protect the equitable rights of the several members of the firm therein.

The separate creditors, of individual partners, have no equitable right to any part of the partnership property until the debts of the firm are provided for, and the rights of the partners, as between themselves, are fully protected.

The general lien of a judgment creditor, upon the lands of his debtor, is subject to all equities which existed against such lands, in favor of third persons, at the time of the recovery of the judgment. And the court of chancery will so control the legal lien, of the judgment creditor, as to restrict it to the actual interest of the judgment debtor in the property; so as fully to protect the rights of those who have a prior equitable interest in such property, or in the proceeds thereof.

THIS was an appeal, from a decretal order of the late vice chancellor of the first circuit, relative to the disposition of the surplus moneys, upon the sale of mortgaged premises, under a decree of foreclosure. Peter Naylor and Palmer Sumner were formerly in copartnership, and the mortgaged premises were conveyed to them, by a debtor of the firm, in payment of a co-partnership debt. Upon the winding up of the affairs of the copartnership, Naylor had to pay out, to the creditors of the firm, about $5000 beyond his rateable proportion of the debts. And for the balance thus due to him he recovered a judgment against Sumner, in the superior court of the city of New-York, on the 20th of May 1842. On the same day he procured a transcript of the judgment, from the docket in the office of the clerk of the superior court, and delivered the same to the clerk of the city and county of New-York, where the mortgaged premises were situated, to be filed and docketed according to law. The transcript was filed, and the judgment duly docketed by such clerk, on the 20th of May, 1842, except that he mistook the christian name of Palmer Sumner for the family name, and therefore docketed the judgment under the letter P. instead of the letter S.; and placed the real christian name first, in the entry upon the docket. In December, 1842, the president, directors and company of the Mount Vernon Bank recovered a judgment, in the same court, against Palmer Sumner and George Stevens, for about $1800; which judgment was duly docketed in the office of the clerk of the city and county of New-York on the same day. The bill in this suit was subsequently filed, to foreclose the mortgage, and the appellant and respondent were both made parties to the suit; but the appellants and their solicitor were ignorant of the existence of the judgment of Naylor, until after the sale of the mortgaged premises, by the master. An application was afterwards made to the superior court, by Naylor, to have the docket of his judgment amended nunc pro tunc; and the motion was granted, without prejudice to the rights of subsequent judgment creditors, whose judgments were docketed previous to that application.

Upon a reference to a master to ascertain who was entitled

Buchan *v.* Sumner.

to the surplus moneys, and the priorities of the liens of the several claimants, the master decided that Naylor was the owner in fee of one half of the mortgaged premises, and was therefore entitled to one half of the purchase moneys, on that ground. He also reported that Naylor's judgment was entitled to priority in payment, over the judgment of the Mount Vernon Bank, out of the other half of the surplus moneys. The Mount Vernon Bank excepted to this last part of the master's report. And, upon argument of the exceptions, the vice chancellor overruled them; and directed the clerk to pay the surplus moneys to Naylor. From this order the Mount Vernon Bank appealed to the chancellor.

*W. J. Hoppin & S. C. Williams,* for the appellants. The question before this court may be briefly stated thus: Which of two judgment creditors of Sumner has the prior lien upon the mortgaged premises, and consequently on the surplus moneys in this suit; Peter Naylor, whose judgment was obtained on the 20th May, 1842, but on account of a mistake of the county clerk, was not docketed in his office, according to the statute, until the 9th day of December, 1844: or the Mount Vernon Bank, whose judgment was obtained and docketed in the county clerk's office two years previously, on the 9th day of December, 1842? The appellants contend that they have the prior lien; and in that behalf insist, 1. That the lien of the Mount Vernon Bank on the surplus moneys in this suit is prior in law to that of Peter Naylor; 2. That a court of equity can give Naylor no relief in the premises; and 3. That the appellants have equitable claims which entitle them to the favorable consideration of this court : I. The lien of the judgment of the Mount Vernon Bank against Palmer Sumner is prior in law to that of the judgment of Peter Naylor against Sumner. The judgment of the bank became a lien on the estate of Palmer Sumner on the 9th day of December, 1842, when it was docketed according to law, in the office of the clerk of the city and county of New-York. The following is the substance of all the statutes regulating the liens of judgments on real estate,

Buchan v. Sumner.

important to be noticed in this connection. By 2 *R. S.* 359, § 3, it is provided that all judgments hereafter rendered in any court of record, shall bind and be a charge upon the lands, tenements, real estate and chattels real of every person against whom such judgment shall be rendered, which such person may have at the time of docketing such judgment, or which such person shall acquire at any time thereafter; and such estate and chattels real shall be subject to be sold upon execution to be issued on such judgment. By 2 *R. S.* 359, § 12, no judgment shall affect any lands, tenements, real estate or chattels real or have any preference as against other judgment creditors, purchasers or mortgagees, until the record thereof be filed and docketed as therein directed. By 2 *R. S.* 359, § 13, the mode of docketing is prescribed thus: At the time of filing a record of judgment, the clerk shall enter in an alphabetical docket, in books to be provided and kept by him, a statement of such judgment, containing 1. The names at length of all the parties to such judgment, designating particularly those against whom it is rendered, with their places of abode, title, trades or professions, if any such are stated in such record. 2. The amount of the debt, damages, or other sum of money recovered, with the costs. 3. The hour and day of entering such docket. 4. If the judgment be against several persons, such statement shall be repeated under the name of each person against whom the judgment was recovered, in the alphabetical order of their names respectively. By the 25th section of the act concerning costs and fees in courts of law and for other purposes, passed May 14, 1840, (*Laws of* 1840, *p.* 334,) no judgment or decree, which shall be entered after the act takes effect, shall be a lien upon real estate, unless the same shall be docketed in books to be provided and kept for that purpose, by the county clerk of the county where the lands are situate. If such judgment shall not be docketed within ten days from the time when it was perfected, it shall only be a lien from the time of docketing. (§ 26.) After this act takes effect, the judgments of the superior court of the city of New-York, and of all mayors' courts, shall be docketed with the clerk of the county where

Buchan *v.* Sumner.

the same is held, before such judgments shall become a lien. (§ 28.) The county clerk shall provide and keep proper books, in which he shall docket all judgments and decrees in their regular order, according to priority, whether the judgment be rendered in the court of which he is clerk, or in some other court, and in all cases shall specify the court in which the judgment or decree was recovered or made. (§ 34.)

The judgment of the appellants was docketed according to the provisions of all the above statutes, in the offices of the clerks of the superior court, and of the city and county of New-York, on the 9th day of December, 1842, and consequently became a lien on that day. Naylor's judgment was not a lien on Sumner's real estate until the 9th day of December, 1844, when it was first docketed in the office of the clerk of the city and county of New-York, and two years after the judgment of the appellants was docketed. The filing of the transcript of Naylor's judgment, and other proceedings of the 20th May, 1842, did not amount to a docketing according to the statutes. Merely filing the transcript with the county clerk was not docketing : the statutes speak of filing and docketing. Entering this judgment under the name of Sumner Palmer was no better than entering it against John Smith or any other name. The object of the statutes is to have notice given. And this object was as effectually defeated by entering the judgment against Sumner Palmer, as if it had been entered against John Smith. It has been decided, under the registry laws in England, that if the name of a defendant be falsely entered, as Compton for Crompton, the judgment will be void against purchasers, and the court will not amend the record. (*Sales* v. *Crompton*, 1 *Wils.* 61. 2 *Strange,* 1209.) The revised statutes prescribe the mode of docketing judgments; which mode must be holden to apply to the clerks of counties, as well as to the clerks of the supreme court, as no other method is pointed out by law. These statutes prescribe that an alphabetical record shall be kept, in which the names at length of all the parties shall be kept, designating particularly the defendants. Now this would be an absurdity, except it be holden to mean that their sur-

names shall be arranged in alphabetical order. Naylor, by an application to the superior court to docket his judgment nunc pro tunc, clearly admitted that it was not docketed at the time of the application. If it had been docketed, there was no necessity for the application. The object of the application was to have the judgment docketed in such a manner as to make it a lien on the surplus in this cause. If it were already a lien, no such application was necessary. The superior court, by the order which they made upon that application, clearly recognize the fact that the judgment had not been previously docketed according to law. If it had been docketed so as to have a binding force, they would have rejected the application as unnecessary.

It is contended on the other side, that it is the date of the judgment, and not the docketing, which establishes the priority of lien to the surplus moneys in a forecloeure suit; and that the statutes which require the docketing of judgments are intended for the protection of bona fide purchasers or incumbrancers only. Such a construction as this is directly opposed to the language and spirit of the statutes. It will not be seriously denied, that the liens upon the surplus moneys are to be marshalled in the same way as they would have been upon the real estate, if the mortgage had not been foreclosed. The sole foundation of the right of judgment creditors to the surplus moneys, is their lien upon the real estate from the sale of which the money arises. Now, as to real estate, nothing can be plainer than the words of the statutes, "No judgment shall be a lien until it is docketed," &c. And besides, by § 30 of the act of 1840, no judgment creditor can sell lands under execution until his judgment is docketed in the county where the lands lie. This clearly shows the intention of the legislature to give him a preference not only against subsequent incumbrancers, but against prior judgment creditors whose judgments had not been docketed. It would be a monstrous doctrine for this court to hold that masters, to whom it is referred to ascertain the priority of liens in a cause, have power to go behind the dockets of judgments, and report that one judgment is to be preferred to

another solely because it was obtained at an earlier date. It is submitted, therefore, as being conclusively shewn, that Naylor's judgment was not a lien on Sumner's real estate until the 9th day of December, 1844, when it was first docketed in the county clerk's office, and two years after the docketing of the judgment of the appellants.

The order of the superior court docketing Naylor's judgment nunc pro tunc as of May 20, 1842, with a proviso, does not make Naylor's judgment a lien prior to the appellants' judgment; but on the contrary it expressly recognizes the priority of the bank. This is apparent from the express terms of the proviso, that the clerk shall express in the said book of dockets opposite said defendant's name where said judgment is docketed therein, that the rights of judgment creditors of said Palmer Sumner, whose judgments shall have been docketed in the said office of the clerk of the city and county of New-York between the said 20th day of May, 1842, and the day of entering this rule, shall not be prejudiced by such alteration of said book of dockets. This proviso clearly saves all the appellants' rights. The word rights, as used in this order, is a comprehensive one, covering legal as well as equitable rights, liens and privileges. It is accompanied by no limitation or restriction; and if it means any thing, it means that all the rights, of every name or kind, which the appellants possessed in the premises before the 9th day of December, 1844, were not to be prejudiced by this order: that the appellants, at any rate, were to retain the same rights against Sumner's real property which they had before the order was entered. It has been argued on behalf of Naylor, that the court, by this order, intended to reserve only the equities of the judgment creditors embraced in the category of the proviso. But this interpretation would be limiting and contradicting the express terms of the proviso; and would, besides, be irreconcilable with the line of argument upon which the application was resisted, and which, it is believed, was sustained by the court. If the court had meant to reserve only the equities of those creditors, it would have chosen a different phraseology.

Buchan v. Sumner.

And not only does this order by its express terms recognize the prior lien of the judgment of the appellants, but the court could not lawfully have made an order which should interfere with those prior rights. The superior court, by cutting off the prior lien of the Mount Vernon Bank, would have destroyed a right vested in the bank, at the time the statute was passed, authorizing that court to amend the docket of its judgments in the county clerk's office. And this was the principal ground on which the application was resisted. The application to the superior court, by Peter Naylor, was made under an act regulating liens on real estate by judgments and decrees, passed April 1st, 1844, sixteen months after the lien of the Mount Vernon Bank accrued. The seventh section of that act provides that the supreme court, the court of chancery, the superior court of the city of New-York, and the several mayors' courts, shall respectively have and possess the same jurisdiction and power concerning the dockets of their judgments kept by the several county clerks, which the supreme court possesses concerning the dockets of its judgments in the office of the clerks of the said supreme court; and may, in the same cases, direct the amending and correcting of such dockets, and the docketing of judgments nunc pro tunc, with the said county clerks. It was not pretended that the superior court had any power and authority in the premises, except that given by this act. Now this act, in its terms, did not require a retrospective construction; and on this account, if no other, it should not have been extended to that case. In *Johnson* v. *Burrell*, (2 *Hill*, 238,) the court say, it is a general rule that a statute affecting rights and liabilities, should not be construed so as to act upon those already existing; to give this effect, the statute should in terms declare an intention so to act. It is unnecessary to mention authorities to show the general rule that a statute will always be holden to relate to the future, unless its intention to control the past be expressly mentioned.

But the chief reason why the superior court could not lawfully have interfered with the prior lien of the bank, and the principal ground upon which the application of this law of

1844, to the Mount Vernon Bank judgment was resisted, was, as before stated, that the court by applying that law to that judgment, would destroy a right vested in the bank. The lien of the judgment of the bank was a vested right long before the 1st day of April, 1844, the day this act was passed. On the 9th day of December, 1842, the Mount Vernon Bank acquired the right to hold a judgment, which was the first charge on the lands, tenements and chattels real of Palmer Sumner, which he had on the 9th day of December, 1842, or should thereafter acquire, and to sell such lands, &c. under their execution without interference from any creditor; and if such lands, &c. should be sold under a foreclosure, and a surplus should remain in the master's hands, to be first paid out of such surplus, to the extent of their judgment. These were absolute rights, fixed and vested in the bank on the 9th day of December, 1842, not in a state of contingency or suspension, but rights of which they could not have been deprived by any means or process known to the law before April 1, 1844. By no provision known to the law previous to that date, could Naylor's judgment have been docketed nunc pro tunc in the county clerk's office. There was no power in any officer or judicial tribunal to correct the dockets of the county clerk. He was an independent officer. Neither he nor any other person had the power to amend or interpolate the records in his office after the entries were once made and rights had thereby accrued. The law was imperative, without modification or saving clause. If such judgment shall not be docketed within ten days from the time when it was perfected, it shall only be a lien from the time of docketing. (*Sess. Laws,* 1840, *p.* 334; § 26.) It is submitted, therefore, that the law requiring the docketing of judgments in the county clerk's office being absolute, and there being no power in any officer or tribunal of law or equity to docket Naylor's judgment there nunc pro tunc, until the act of April 1, 1844, the priority of the Mount Vernon Bank acquired on the 9th of December, 1842, became a vested right, and was a vested right when that act was passed.

But no rule of law is better known or more clearly estab-

lished than this, that an act of the legislature is not to be
construed to operate retrospectively, so as to take away a
vested right. It was so settled as long ago as Bracton. (6
*Bac. Abr.* 370, *Gwillim's ed. Stat. c.*) This great princi-
ple is explained and enforced most fully in the case of *Dash*
v. *Van Kleeck*, (7 *John. Rep.* 477,) where Justices Kent,
Thompson and Van Ness, decided that a retrospective con-
struction cannot be given to an act of the legislature where a
vested right would be destroyed thereby; and Justices Spencer
and Yates dissented, not from opposition to the general princi-
ple, but because they thought the act of April, 1810, merely
declaratory. (*See also* 1 *Kent's Com.* 455; *Beadleston* v.
*Sprague*, 6 *John. Rep.* 101; *Dwarris on Stat.* 681; *Butler*
v. *Palmer*, 1 *Hill*, 324; *Couch* v. *Jeffries*, 4 *Burr. R.* 2460;
8 *Wend. R.* 661.)

In opposition to this application to the superior court to give the
act of April, 1844, a retrospective operation, it was argued, that if
the doctrine maintained on the other side should be carried out
to its legitimate ends, the superior court might order the bank
to refund any money that might have come into their hands
by virtue of their priority. Supposing this mortgage had been
foreclosed before April, 1844, and a surplus then had come into
the hands of Master Ruggles, the bank's priority would have
been indisputable, and they would certainly have obtained the
money. Would the superior court now, after the passage of
the act, grant an order taking the money out of the hands of
the bank? Certainly not; but they might as well make such
an order as to give priority to Naylor's judgment by virtue of
the act of 1844. It is believed that the superior court sustained
this line of argument by granting the favor asked for, without
prejudice to the rights of that class of judgment creditors in
which the appellants are included. The order was drawn by
the counsel for the bank, and it was stated to that counsel by
the justice who signed the order, that the court had found it
impossible to stretch the act of 1844 backward, so as to cover
the priority of the judgment of the bank; and the counsel
clearly understood that to have been the principal ground of

the proviso in the order. It is submitted, therefore, that the superior court could not legally have given any order which would have postponed the priority of the bank to that of Mr. Naylor; and that if the language of the order which they gave be at all ambiguous (which is denied) that construction is to be adopted which supports its legality.

It is considered that the first point of the argument has been made out, viz: That the lien of the judgment of the Mount Vernon Bank against Palmer Sumner is prior in law to that of the judgment of Peter Naylor against Palmer Sumner upon the surplus moneys in this cause; because, 1. The judgment of the bank was a lien on the 9th day of December, 1842. 2. Naylor's judgment was not a lien until the 9th day of December, 1844; and 3. The order of the superior court docketing Naylor's judgment nunc pro tunc, as of May 20, 1842, with a proviso, does not make Naylor's judgment a prior lien; but on the contrary, expressly recognizes the priority of the bank; and the court could not lawfully have made an order which would have cut off the prior lien of the bank.

II. A court of equity can give Naylor no relief in the premises. It will not be pretended that this court can make an order directing the county clerk to amend or correct his docket of judgments, in any way. The only grounds upon which the aid of this court can be invoked, would be to show, 1. That the mistake of the county clerk was such an accident as this court can relieve against in this case, and therefore, that it should consider Naylor's judgment as properly docketed on the 20th May, 1842, and give it priority accordingly : or, 2. That Naylor's judgment was obtained upon prior equitable claims which entitle it to precedence notwithstanding the previous docketing of the judgment of the bank. The mistake of the county clerk was not such an accident as this court can relieve against in this case. His honor, the late vice chancellor of the 1st circuit, founds his order, overruling the exceptions, solely upon the point that this was such an accident or mistake as this court can relieve against. The counsel for the appellants, with great deference to the opinion of the vice chancellor, sub-

Buchan *v.* Sumner.

mit that an examination of the principles and authorities will not sustain it. Before entering upon this, however, let it be premised, that the assumption of his honor, that the error in docketing occurred without any fault of Mr. Naylor or his attorney, admits of some question. It is the well known practice of many attorneys to see that judgments obtained by them are correctly docketed, and when they are sent to other counties for that purpose, it is usual to require of the clerks of those counties certificates that this duty has been performed. Had this been attended to in the present case, the error would not have occurred. The cardinal principle which controls this branch of the case is, that equity can give Naylor no relief against the express provisions of a statute. It cannot put his judgment, which was unaccompanied by the execution of an act required by law to render that judgment binding, before another judgment which followed the necessary statutory requisitions, on the ground of mistake or accident. For chancery to relieve against the express provision of an act of parliament, would be the same as to repeal it. Equity, therefore, will not interfere in such cases, notwithstanding accident or unavoidable necessity. (*Fonblanque Eq. vol.* 1, *p.* 2, 3.) The remedial power of courts of equity does not extend to the supplying of any circumstances, for the want of which, the legislature hath declared an instrument to be void. (*Idem, p.* 54, *note.*) Where a rule, either of the common or statute law, is direct, and governs the case with all its circumstances on the particular point, a court of equity is as much bound by it as a court of law, and can as little justify a departure from it. If the law commands or prohibits a thing to be done, equity cannot enjoin the contrary, or dispense with the obligation. (1 *Story's Eq. Juris.* 72.)

In *Crooke* v. *Bampfield,* (1 *Ch. Ca.* 227,) where a lease was bad according to the statute, the lord chancellor was called upon by a party who had strong equities, for relief. That officer said, " and the chancellor may not add to a statute to make a saving which the statute hath not made." There is a class of cases illustrating this point, in which the courts of equity in England have been called upon to give relief against the ship

registry acts, and have declined to do so. By statute 34 Geo. 3, c. 68, § 14, it is enacted that no transfer, &c. of property in any ship, &c. made after a certain date, shall be valid or effectual for any purpose whatever, either in law or equity, unless such transfer, &c. shall be by bill of sale containing certain recitals. In *Thompson* v. *Leake,* (1 *Madd. Ch. R.* 39,) a sale had been made by defendants to plaintiffs, of a ship, but the provisions of the registry act had not been complied with, on account of the certificate of registry being mislaid—a pure accident and without any fraud—indeed, as much without any fault on the part of the defendants as on Naylor's part in this suit. The bill prayed that the defendants might be decreed to carry the sale specifically into execution, &c., so that the legal title might be properly passed. Sir Thomas Plumer, V. C. said: Independently of the acts of parliament, the plaintiff would be entitled to relief; but we are here tied down by positive acts of parliament, and it would be repealing the act for a court of equity to give relief in this case. In cases of accident and mistake, the court, in various instances, relieves, but will not, in the case of a defective title to a ship. The act of parliament destroys the contract when not according to the prescribed forms. A man has not, as in other cases, a contract to stand upon. So, in this case, the act of the legislature destroys the lien of the judgment when not docketed according to the prescribed forms. There is nothing for the judgment creditor to stand upon. The judgment alone gives him no specific lien; and he asks this court not to mend a claim which he once had, and which by accident has been broken, but to give him a new one, such as he never possessed. If this court grants the request, it will effectively repeal the docketing act of 1840. (*See also Thompson* v. *Smith,* 1 *Madd.* 401; *Mestaier* v. *Gillespie,* 11 *Ves.* 621, 627; *Curtis* v. *Perry,* 6 *Id.* 739; *Rolleston* v. *Hibberd,* 3 *Broom's Ch. Ca.* 571.) There have been similar decisions under the annuity acts and the stamp acts. (*See Toulmin* v. *Price,* 5 *Ves.* 540,) In *Davis* v *The Earl of Strathmore,* (16 *Vesey,* 419,) the ground upon which the court refused relief to a purchaser who had notice of a prior unregistered

judgment, was that he had notice of the previous judgment. Mr. Sugden, in commenting on the case, says: If a purchaser has notice of any judgment, the statute does not in equity extend to him; as he is already in possession of what the legislature intended to furnish him with. (*Sugden on Vendors,* 675.) This case of *Davis* v. *The Earl of Strathmore,* which seems to be the strongest in the books, has no weight against the appellants here; because, in the first place, we conceive the New-York statute of 1840, to be as extensive and sweeping in its phraseology as the English ship registry and annuity laws, and therefore not to be included among those acts, which, according to Lord Eldon, may be relieved against in chancery. It will be seen by comparing the New-York statute with the 4 and 5 W. & M. c. 20, and the other English acts, how much more general and extended is the language of our law. In the second place, the sole element which gave the court jurisdiction in the case in Vesey, to wit, the notice, is wanting here. It appears by the testimony in this case, that neither the appellants, nor their solicitor, nor any person on their behalf, had any notice whatsoever of this judgment of Naylor's against Sumner, until the thirteenth day of November, 1844, and a long time after their own judgment was docketed; but, on the contrary, had fully believed, up to that time, that they were the prior judgment creditors, and had acted accordingly.

The construction given by the respondent to the statute of 1840 seems to be entirely unwarranted, to wit: that it was made for the protection of bona fide purchasers and incumbrancers only. It was undoubtedly made for the protection of creditors also. As it required judgments to be docketed in a particular county before execution could issue there, it furnished means for business men to examine into the affairs of their debtors before granting them credits. The court found great difficulty in claiming jurisdiction in *Davis* v. *The Earl of Strathmore,* where ample notice of the judgment was proved. How can the court pretend to jurisdiction here, where no such notice is shewn?

In respect to the registry of mortgages, the language of the

court of equity is, it is the duty of the incumbrancer to see his mortgage duly registered, or equity will not assist him. (*Frost* v. *Beekman,* 1 *John. Ch. Rep.* 299.) See also the case of *Astor* v. *Wells,* (4 *Wheat.* 466,) which is very strong on this point. It must be remembered, in considering this branch of the case, that judgments are statutory not equitable rights. Judgments are statutory liens rather than liens in equity. The remedies of creditors in respect of them are derived under act of parliament. (*Cross' Law of Lien,* 101.) Naylor was entitled to no preference in chancery because he obtained his judgment at an earlier day than the bank. One judgment creditor has an equal right with another, before this court, so far as the mere time of obtaining a judgment is concerned. Other things being equal, all judgment creditors, in the eye of a court of equity, are entitled to the same favor. If one of them shows a judgment fortified by all the legal formalities required to give it a lien, and the other a judgment unaccompanied by these, equity can have no choice: it must give the preference to the former.

Again; Naylor having applied to the court, from which the judgment issued, to have it docketed nunc pro tunc, and that court having decided not to grant the relief so far as to give him a preference over the appellants, he must be bound by that decision, and can get no relief in equity. The case of *Brinkerhoff* v. *Marvin,* (5 *John. Ch. Rep.* 320,) is in point here. In that case the judgment creditors had discussed their respective rights as to priority, before the supreme court, and that court had made an order settling their rights. The chancellor, therefore, held that the decision of the supreme court was conclusive. The mistake of the county clerk was not such an accident or mistake as a court of equity can relieve against, in this case.

Naylor has no prior equitable claims which are to be preferred to the judgment of the appellants; and therefore the appellants having the legal right, will prevail. We are aware of the decision of this court, *In the matter of Howe,* (1 *Paige's Rep.* 125,) that judgment creditors have no preference over prior equitable claims against the estate of a debtor. And also in *White* v. *Carpenter,* (2 *Paige's Rep.* 219,) that the general

lien of a judgment is controlled by equity, so as to protect the
rights of those who are entitled to an equitable interest in the
lands, or in the proceeds thereof; and in other cases to the
same effect.   In considering this branch of the case it is sub-
mitted, that if Naylor ever had any specific, equitable lien, that
lien has now become merged in a legal lien, and must be gov-
erned by strict legal rules.   It would seem that whatever equi-
table rights Naylor may have had against this real estate, he
merged them in legal ones, by taking a judgment against Sum-
ner, which has been made by order of the court a lien on all
his real estate.   The maxim *æquitas sequitur legem*, controls
this case.   How can Naylor insist upon equitable claims against
Sumner, when he has a complete remedy at law?   Both par-
ties have put their claims in the shape of legal judgments:   the
law has given both certain liens on Sumner's real estate.   Will
equity extend and modify those liens?   Mr. Naylor made his
election, and exchanged whatever equitable rights he held, for
certain fixed legal rights.   His remedy was complete in a court
of law.   Equity has nothing to do but to ascertain the legal
rights of the parties, and decide accordingly.   In *Codwise* v.
*Gelston*, (10 *John. Rep.* 507,) Chief Justice Kent says, if a fund
for the payment of debts is created under an order or decree in
chancery, and the creditors come in and avail themselves of it,
the rule of equity then is, that they shall be paid in pari passu,
or upon a footing of equality.   But when the law gives priority,
equity will not destroy it; and especially where legal assets are
created by statute, as the judgment lien was here, they remain
so, though the creditors be obliged to go into equity for assist-
ance.   (2 *Fonb.* 403, 404.)   The legal priority will be protect-
ed and preserved in chancery.   See also *Plunket* v. *Pinson*, (2
*Atk.* 290.)   The only ground upon which Naylor can have
a prior equitable lien must arise from considering the real es-
tate mortgaged as partnership property, which it was not.
Merely obtaining a judgment at an earlier day gives Naylor no
priority in a court of equity, as was just now shown.   If this
equitable claim of Naylor's amounts to any thing, it is such an
one as would have given him a priority to the judgment of the

bank, even if he had never taken a judgment himself against Sumner.

It is contended on the other side that each partner has a lien upon the whole of the partnership property, for the payment of the partnership debts. But this real estate was not partnership property. It was not considered to be such by the partners themselves. It was not property used in the business of the firm—in the tin-plate working business. The only connection whatever it had with the partnership was, that it was taken for a partnership debt. It was conveyed to Sumner & Naylor as tenants in common. It does not appear that it was conveyed to them in their partnership name. That they did not consider it partnership property, is evident from the agreement at the dissolution of the partnership, as stated by Mr. Naylor in his affidavit. The intention was to divide all the partnership property. No division of this was made. It was understood to be already divided, and held by each partner as private property. If the debts receivable are not sufficient to pay the debts payable, Sumner is to be personally bound for half the overplus. Not a word is said as to the real estate. The business of the concern was closed, and if the whole real estate was to have been at the disposal of Naylor, would not that have been specially agreed upon? The clear inference is, that they themselves understoood that each held an undivided half of this property, as his own private property, without being subject to the control of the other in any way whatsoever. Again; if it were partnership property in their eyes, the taking of the judgment as security for the advances, was clearly unnecessary, so far as the land was concerned. It would have been bound without the judgment. The judgment, Naylor swears, was intended as security. If by this, he meant to obtain a lien on Sumner's part of the Crosby-street and Eleventh-street property, it was a clear recognition that it was individual property. What seems fully to settle this question is this, that Mr. Naylor, in his affidavit on the reference, claimed to be entitled to one half part of the surplus, as owner of the fee of one half part of the mortgaged premises, proved his claim as such before the

Buchan v. Sumner.

master, and has already received the half of such surplus moneys under an order of this court. He claimed the other half by virtue of a judgment. He thus clearly recognizes a tenancy in common in this real estate, without pretending to any lien on the same as a partner. But even if this property had been purchased with partnership funds, for the purpose of being used in partnership affairs, it would still be regarded as the individual property of the partners ; and equity would not apply it to pay partnership debts, in the absence of an express agreement between the partners to consider it as partnership property. This important principle is clearly stated by his honor the vice chancellor of the first circuit, in the case of *Smith* v. *Jackson*, (2 *Edw. Ch. Rep.* 28,) where it was holden that if a purchase be made and a conveyance taken to partners as tenants in common, without any agreement to consider it as stock, although it be paid out of their joint funds and to be used for partnership purposes, it will be deemed real estate. In that case, the case of *Coles* v. *Coles*, (15 *John. Rep.* 159,) is commented upon, and the doctrine established therein to the like effect by the supreme court confirmed. And in respect to this case, and that of *McDermot* v. *Lawrence*, (7 *Serg. & Rawle*, 438,) his honor says that they go to show, in the absence of any such agreement, that the lands purchased and held by a partnership, even for the purposes of the firm, will, as between the representatives of the real and personal estate of a deceased partner, and between the creditors of the firm and a separate creditor who has acquired a lien by mortgage or otherwise upon the individual share of one partner, in good faith, be considered as real estate, both in law and equity. So in commenting upon the case of *Winslow* v. *Chiffelle*, (*Harp. Eq. Rep.* 25,) his honor acknowledges the propriety of the doctrine that joint creditors have a lien on lands where the lands have become partnership property. Yet, I think, he continues, lands can only be rendered so, by some express agreement and understanding of the several partners, and not merely by purchasing with joint funds and taking the title in their joint names. No agreement of the sort required in these decisions exists in the present case

Buchan *v.* Sumner.

The land was conveyed to satisfy an old partnership debt, and the title stands in the individual names of the partners. This is all. It was not even used for partnership purposes. As before shown, it seems to have been expressly recognized as individual property. At any rate it is clear, upon the authority of these decisions, that it can never be pronounced partnership property. It follows then, that Naylor has no prior equitable claims against this real estate, which are to be preferred to the judgment of the appellants, and that, as Naylor has no such superior equity, the appellants having the legal right must prevail. And upon this ground, and because the mistake of the county clerk was not such an one as this court can relieve against, in this case, it is considered that the second point of the appellants has been made out, to wit: that a court of equity can give Naylor no relief in the premises.

III. The appellants have certain equities which entitle them to the favorable consideration of this court. It appears by the affidavit filed with the master, that the appellants having made all the usual and necessary inquiries, by inspection of original searches and otherwise, to ascertain their lien upon Sumner's real estate, and arrived at the full belief from such examination that they were the senior incumbrancers by judgment upon the same, and without any notice of the Naylor judgment, and trusting that the Eleventh-street property would yield a surplus, omitted to bid upon the Crosby-street property to its reasonable value, and allowed it to be bought in by Mr. Naylor for $8000, when it was worth $10,000. By so doing, and by omitting to bid upon the Eleventh-street property to its full value, they suffered these estates to be sold for a much less sum than they would have otherwise brought. Whereas, if they had not been impressed with the belief of their priority, they would have taken such measures as to have caused the real estate to bring a sufficient sum to satisfy all the incumbrances by mortgages and Naylor's judgment, and leave a surplus for themselves : or at any rate, a sufficient sum to reduce Naylor's judgment very considerably, and thus increase the value of their own lien upon Sumner's remaining real es-

Buchan *v.* Sumner.

tate : and it does not appear but that Sumner has other real estate to be affected by these judgments.

In estimating the equities in this case, this fact, also, is an important one, that Naylor, through the confidence on the part of the appellants in their superior lien, and their ignorance of his judgment, was enabled to purchase Sumner's share of the equity of redemption in the Crosby-street property for $1000 less than its actual value, since Naylor paid only $8000 for what was worth $10,000 : that is to say, he has actually saved an amount equal to the sum in controversy in this cause, through this confidence on the part of the appellants in their priority. It appears also, that chiefly on account of this confidence in their priority, the appellants have incurred considerable expense in various suits and proceedings, for counsel fees and otherwise, which they would not have otherwise incurred ; a large part of which were incurred before they had any notice whatever of Naylor's judgment. All these circumstances give to the appellants a strong claim to the equitable consideration of the court, and an equitable priority ; particularly if the language of this court in *Frost* v. *Beekman,* (1 *John. Ch. Rep.* 299,) should be applied to judgments.

Mr. Naylor, in this case, ought to have taken care to have his judgment properly docketed ; and if by his omission to do so, injury happens to other parties, they are to be protected by this court. It is to be considered also, that Mr. Naylor has a perfect right of action against the county clerk, for any injury he may sustain from the misfeasance or omission of that officer.

These considerations entitle the appellants not only to their costs and expenses in the premises, but also to an equitable priority in the distribution of the surplus fund. The appellants therefore ask for an order reversing the order of the vice chancellor with costs, and allowing the exceptions to the master's report, and directing that the clerk of the first circuit pay over to the president, directors and company of the Mount Vernon Bank, or their solicitor, all the surplus moneys remaining in court to the credit of this cause ; first deducting therefrom the commissions to which the clerk is by law entitled.

*H. Holden & J. T. Brady*, for the respondents. The first proposition of the learned counsel for the appellants is, that the lien of the Mount Vernon Bank upon the surplus moneys in this cause is prior in law to that of Peter Naylor. The first consideration that presents itself here is this: What shall constitute the ground of priority? The counsel for the bank says, the date of the docket of the judgment, as it appears on record. We say, the date of the actual entry of the judgment. This is not a proceeding in which a bona fide purchaser or mortgagee seeks to enforce a lien of record against one set up that is not of record. There is a fund in court to be distributed or paid out to him or them who shall show the earliest right to it. The well known maxim applies here, *qui prior est tempore, potior est jure*. What gives either the bank or Mr. Naylor any right to claim this surplus money? Not that he has procured an entry of a judgment to be made on the docket; for this would avail nothing if there was not a legal judgment equitably due. It is therefore the judgment which gives either claimant the substantial right to payment out of surplus money. Naylor having the first judgment, is clearly entitled to be paid first, unless this right be taken away by some statutory provision. Is there any such provision?

The counsel for the bank insist that the various statutes cited by them give the priority of lien to the judgment creditor whose judgment was first docketed, though its rendition be subsequent to that of the one it is made to supersede. We answer, that all those statutes are intended for the protection of bona fide purchasers or incumbrancers, who might be defrauded if their deeds or mortgages, taken in good faith, should be exposed to the danger of postponement to a judgment never recorded, so as to give notice of its own existence. None of the statutory provisions apply to a case like this, where a subsequent judgment creditor seeks to obtain priority of a former, because of a mistake, of a public officer, which has done such subsequent creditor no injury. It is not shown, nor is it pretended, except by way of argument, and no fact is adduced to show, that the Mount Vernon Bank gave credit to Sumner

because there did not appear to be any judgment recorded against him. Even if this had been proved, it could not, as we submit, alter the case here; for, as we shall presently show, under another branch of this argument, the loss of the bank, if any, would, even in the case supposed, be one for which neither law nor equity affords redress. We have, then, the Mount Vernon Bank claiming precedence of Mr. Naylor, because the public officer, whose duty it is supposed to be to see his judgment properly docketed in the county clerk's office, transposed the christian and surname of Palmer Sumner, putting the former first instead of the latter; and because the christian name had priority in the docket, the bank claims priority in the distribution of this fund.

If the court should consider that the claimants here are entitled to priority, not according to the dates of their judgments, but of the dockets of the same, we submit two propositions to protect us from postponement: 1st. That our judgment was in fact docketed before that of the bank; 2d. That if it were not so docketed in fact, the order of the superior court gives it its legitimate place on the record. The act provides, that no judgment shall, after the passage of that law, be a lien upon real estate, unless docketed in books to be provided and kept for that purpose by the clerk of the county where the lands are situated. When shall the judgment be considered as docketed, so far as the rights of the judgment creditors are concerned? We answer, when the transcript of the judgment has been delivered to the county clerk. It is not the duty of that creditor to see that the public officer does his duty. The opinion of Chancellor Kent, in the case of *Frost* v. *Beekman*, (1 *John. Ch. Rep.* 288,) cited by the learned counsel, has no application to the new system of dockets. It can hardly be the duty of a judgment creditor to have a special agent in every county to see that a judgment is properly docketed. If, by the omission of the clerk, a subsequent purchaser, or mortgagee, in good faith, is injured, and the question arises between two innocent persons as to who shall bear the loss, the mortgagee or grantee being without blame, the loss will be cast upon the judgment cred-

Buchan v. Sumner.

itor who by abundant caution might have had the docket correctly made.   But when advantage is sought to be taken of this omission, by one who merely has the luck of appearing first on the record of judgments, he cannot be permitted to profit by the mistake which assigns him an unjust precedence.

How must the judgment be docketed in point of form? The counsel for the bank thinks that the surname should appear first in order.   This has been the practice; but the law does not make it necessary.   We insist, therefore, that as between the bank and Naylor, the judgment was sufficiently docketed when the transcript was filed, to prevent one from using or the other gaining by an error which neither had any reason to anticipate.   Again; the order of the superior court has secured us our deserved precedence.   A motion was made to the superior court to have the judgment of Naylor v. Sumner docketed nunc pro tunc, as of the time when it should have been entered. On the hearing of that motion, the counsel for the bank set up the same equities upon which he now relies.   The answer to this branch of his opposition to the motion was, that the superior court was merely called upon to correct the error of a public officer, and not to consider the equities suggested in opposition to that action; and if there were equities, that they would be disposed of in this court.   The counsel now argues, that our having moved the court for this relief is evidence that the judgment was not docketed.   This is not logical.   It is only evidence that we did not consider it docketed.   This court might declare that the motion in the superior court was wholly unnecessary.   This is indeed the opinion of the respondents' counsel now.   They submit that equity will, where no injury would result from a contrary course, give preference to claims according to their real and not their apparent priorities; preferring the substance to the shadow.   The statute, (*Laws of* 1844, *p.* 90, § 7,) gives the superior court power, in express terms, to direct the docketing of judgments nunc pro tunc with the county clerk.   And the court will find, on reference to the case of *Butler* v. *Lewis*, (10 *Wend.* 541,) that while great care has been taken not to permit such an amendment, to the detriment

Buchan v. Sumner.

of a bona fide purchaser, yet it has been liberally allowed in correcting errors of public officers. (*See 2 R. S.* 425; 1 *Peters'd. Abr.* 571, 2.) To maintain his case in this respect, the counsel takes the bold ground that the statute of 1844 would operate to destroy vested rights, if used to effect the end sought by Naylor in this case. He refers to many authorities on this head. But we submit that the answer to his argument and law here, is, that the bank never had a vested right to take precedence of the prior judgment of Naylor. If the bank gained precedence by the mere accidental priority of date in docket, the action of the superior court could not, perhaps, remove it. But in all the cases where statutes have been restrained from retroactive operation upon vested rights, those rights have been such conventional, or equitable rights arising from contract, as could not without injustice be taken away. (3 *Story's Comm. on the Const.* 266. 1 *Kent's Comm.* 413. *Charles River Bridge v. Warren Bridge Company*, 11 *Peters' Rep.* 420.) We think, therefore, that in every point of view our case may be considered free from the objections ingeniously urged by our learned opponents. All the provisions of the various statutes cited by the counsel for the appellants relate exclusively, and are intended to relate, only to liens upon real estate, *eo nomine*, and not to the adjustment of equitable claims to money in the court of chancery. For, though we are well aware that a court of equity will sometimes regard money as real estate, that nice rule is only enforced for the preservation of substantial rights, and the promotion of substantial justice. In this case it cannot be pretended that as to the mere judgment of the bank, any thing has been shown to give it any preference over that of Naylor.

The learned counsel next insists that Naylor has no prior equitable claim to be preferred to the legal lien of the Mount Vernon Bank, which must consequently prevail. So far from admitting this proposition, we insist that even if Naylor had not obtained a judgment, he would yet have an equitable claim to the surplus, in this case, superior to the legal claim of the bank. No rule is better settled, and particularly in the court

Buchan *v.* Sumner.

of chancery, than that partnership property is regarded as a fund for the payment of partnership debts; and any appropriation of it to satisfy claims against one of the firm, while partnership debts exist, is strongly discountenanced. The cases cited below are very conclusive on this point, and show that Naylor, as the copartner of Sumner, has a clear right to the moneys in controversy. (*Hutchinson* v. *Smith*, 7 *Paige*, 72.) In the first place, the moneys represent partnership property—are the proceeds of it. In the next place, Naylor's judgment is for payments made to creditors of the firm of Sumner & Naylor over and above all the assets of the firm, and his proportion of such debts. He therefore is subrogated to the creditors whose claims against the copartnership he satisfied, and has the same right to this fund which they would have if they had not been paid. That right would be superior to the judgment of the bank, though it had been docketed years before its actual entry. The case of *Hutchinson* v. *Smith*, cited above, sustains this position. The counsel seeks to avoid the effect of this argument by insisting that the prior equitable claim of Naylor, if any existed, has been merged in the judgment obtained against Sumner. This is again too technical for a court of chancery, engaged in determining the priority of equities. The judgment, so far from extinguishing, only strengthens, while it represents the equity of Naylor. It is then sought to prove that this is not copartnership property, but real estate, held by Sumner & Naylor as tenants in common. That real estate may be owned by partners, as such, is not questioned by our opponent. Nor do we question the doctrines of his honor the vice chancellor, as expounded in *Smith* v. *Jackson*, (2 *Edw.* 28.) But we have yet to learn that a house and lot conveyed to two persons who are copartners, to pay a copartnership debt, will not be regarded at law and in equity as copartnership property, to which the creditors of the firm have the first claim. The argument of the appellants' counsel on this subject cannot be considered sound, especially when they suggest that the nature of the claim made by Naylor to the surplus moneys in this case, as owner of one half of the fee of the property sold, shows that this was real

estate and not copartnership property.   When the firm of Sumner & Naylor became insolvent, the real property, of which the money in court is the surplus proceeds, was clearly liable to the payment of the partnership debts.   (*Deveau* v. *Fowler,* 2 *Paige,* 400.   *Payne* v. *Matthews,* 6 *Id.* 19.   *Hutchinson* v. *Smith,* 7 *Id.* 26.   *Dale* v. *Halsey,* 16 *John. Rep.* 34.   *Story on Part.* § 363.   3 *Kent's Com.* 64.   *Everingham* v. *Ensworth,* 7 *Wend.* 326.   *Egbert* v. *Woods,* 3 *Paige,* 517.)

The third proposition of the learned counsel for the bank is, that the bank have equitable claims which entitle it to a preference.   The first observation to be made on this point is, that the equitable claims spoken of all arose after the docketing of the judgment of the bank.   There is no pretence that, as to any thing preceding the judgment, or connected with the judgment itself, there was any circumstance conferring upon the bank any peculiar claim.   What are the equitable claims arising since the judgment?   Supposing that there was no judgment prior in date, the bank appeared in the chancery suit.   Under the same impression it permitted the Crosby street property to be bid off by Naylor for $8000, when it was worth $10,000.   As to both these circumstances we would observe, that there are many cases in which a party, acting upon a supposed state of facts, may incur a liability or disregard an advantage, where the law will afford him no redress or compensation, though the error be one into which he is innocently misled.   An unrecorded mortgage will take precedence of a judgment, (*Jackson, ex dem. Tuthill,* v. *Dubois,* 4 *John.* 216,) and yet the party purchasing a judgment at an assignee's sale of the effects of a bankrupt debtor, could not be relieved on the discovery of a mortgage prior to the judgment.   A purchaser at a sheriff's sale, who had searched the records and found no judgment against the defendant in the execution, except the one on which that execution issued, can have no redress, if it turns out that the property, the right, title and interest of the defendant in which he had purchased, had before been sold for assessments, though the deed was unrecorded.   Indeed, in almost every instance of the purchase of real estate, the purcha

ser is in danger of losing his title by some unrecorded convey-
ance, or fraud in a will or deed, or a mistake in family history,
by which the existence of some heir at law may be concealed
or denied. All that can be said of the complaint of the Mount
Vernon Bank in this case is, that it was conceived to be in a
position more favorable than really existed. This error can
operate neither to the benefit of the bank or the injury of Mr.
Naylor. And as to the allegation that Naylor was permitted
to buy in the Crosby-street property at less than its value, if
that be the case, the bank has acted inconsiderately. There
is no pretence that Naylor knew he bought at less than the
highest price that could have been fairly obtained at the sale.

In conclusion, we would submit another view of this matter.
The act requiring transcripts to be filed in the county clerk's
office, introduces an entirely new system. The learned counsel
for the bank takes it for granted that the error in docketing the
judgment of Naylor is chargeable upon the clerk of the county.
Why is this? If it be true that the surname of the judgment
debtor should stand first, it is the business of the clerk who
makes the transcript to put it in that order. What is the tran-
script? An exact copy of the record as it appears in the book
transcribed. From this two results follow : *First*, that the
error, if any, was committed by the clerk of the superior court.
And, *secondly*, that the counsel for the bank should have made
search in the superior court where the judgment was originally
entered. Whether, then, Mr. Naylor be considered as claiming
under his prior judgment, or as a creditor of a copartnership,
against a copartnership fund, he is, in either case, entitled to
the surplus moneys in court.

THE CHANCELLOR. Previous to the revised statutes, a judg-
ment in a court of record, in this state, was a lien upon the
lands of the judgment debtor from the time of the entry of such
judgment; whether docketed or not. But, by the statute then
in force, if the judgment was not properly docketed, it did not
affect the lands of the judgment debtor, as against subsequent
purchasers or mortgagees. (1 *R. L. of* 1813, *p.* 501, § 3.) Even

as to them, however, the undocketed judgment was entitled to priority, in equity, if the purchaser, or mortgagee, had notice of its existence at the time of his purchase, or when he took his mortgage. (*Davis* v. *The Earl of Strathmore,* 16 *Ves. Rep.* 420.) That statute made no provision for priority in favor of the lien of subsequent judgment creditors. The first judgment although not docketed, was therefore entitled to a preference, over the lien of a junior judgment, which had been docketed as directed by the statute. But if the land of the debtor had been sold, by the sheriff, under an execution upon the junior judgment, to a purchaser who was ignorant of the existence of the prior undocketed judgment, such purchaser took the land discharged of the lien of the undocketed judgment.

The revised statutes, however, have made a very material alteration in the law relative to the liens of judgments. For the 12th section of the title in relation to judgments, (2 *R. S.* 360,) declares that no judgment shall affect any lands, tenements, real estate, or chattels real, or have any preference as against *other judgment creditors,* until the record thereof shall be filed and docketed, as therein directed. The effect of this provision of the revised statutes appears to be, to prevent the common law lien of the judgment from attaching at all upon the real estate of the judgment debtor until the judgment has been docketed; and not merely to protect bona fide purchasers and incumbrancers, who had no notice of the existence of the judgment when their interests in, or liens upon, the real estate of the judgment debtor accrued. The provisions of the act of the 14th of May, 1840, on this subject, are also in accordance with this construction of the revised statutes. For the 25th section of that act declares, that no judgment, or decree, which shall be entered after that act takes effect, shall be a lien upon real estate, unless the same shall be docketed, in books to be provided for that purpose, by the county clerk of the county where the lands are situate.

This court may enforce an equitable lien, either upon a legal or an equitable estate in lands. And where the common law, or a statute, creates a lien upon a legal interest in land, this

Buchan v. Sumner.

court, by analogy, sometimes declares and enforces a similar lien upon an equitable estate. But where the lien is created by statute, and the lien itself, as well as the estate against which it is sought to be enforced, is purely legal, this court is not authorized to extend the lien to cases not provided for by the statute. Judge Lane, in delivering the opinion of the supreme court of Ohio, in the case of *Douglas* v. *Huston*, (6 *Ohio Rep.* 162,) says, the existence, validity, and extent of a judgment lien, in that state, are matters purely legal, dependent upon statutory provisions; and that if the lien fails at law, it cannot be aided in equity. And in *Mower* v. *Kipp*, (6 *Paige*, 88,) this court decided that it could give effect to the lien of a judgment, as against subsequent purchasers and incumbrancers, upon a legal title, only so far as the lien could have been enforced by execution at law.

The fact that the error in the docketing of the respondent's judgment, in the office of the clerk of the city and county of New-York, was the error of the clerk, and not the error of the judgment creditor, or of his attorney, does not therefore authorize this court to interfere to deprive another judgment creditor of his legal priority; if he has obtained one by such error of the clerk. The case of *Landon* v. *Ferguson*, (3 *Russ. Ch. Rep.* 349,) was similar to the case now under consideration, in this respect. There the judgments had been carried into the proper office to be docketed, but from some mistake of the officer the dockets were not completed. The judgment creditors claimed a preference, over other creditors of the decedent, in the distribution of his estate upon a creditor's bill. But as the judgments had not in fact been docketed, Lord Gifford decided that the holders of the judgments were not, even in equity, entitled to a priority. (*See also Braithwaite* v. *Watts*, 2 *Cromp. & Jerv. Rep.* 318.)

Upon an examination of the statute, I think the counsel for the appellant is also right in supposing that the respondent's judgment was not duly docketed; so as to entitle it to a priority upon that ground. The revised statutes direct the clerk of the court in which the judgment is recovered, upon the filing of

Buchan *v.* Sumner.

the record, to docket the judgment. And they also prescribe the particular manner in which it is to be done. The clerk is to enter, *in an alphabetical docket,* in the books to be kept for that purpose, a statement, containing the names at length of all the parties to the judgment, the amount of the debt, or damages, with the costs, and the hour and day of entering such docket. And if the judgment is against several persons, such statement must be repeated under the name of each person against whom the judgment was recovered, in the *alphabetical order* of their *names* respectively. (2 *R. S.* 361, § 13.) The act of May 14th, 1840, requires the clerk of the county where the lands are situate, upon the filing of the transcript in his office, to docket the judgment in the manner prescribed by law. And, in addition to the requirements of the revised statutes on that subject, the county clerk must specify the court in which the judgment mentioned in such transcript was recovered, and the day and hour on which the judgment was perfected; as well as the time of the docketing of the judgment by him. (*Laws of* 1840, *p.* 334, § 26.) The statute does not declare, in express terms, that the judgment shall be entered, in the alphabetical docket, under the letter corresponding with the surname of the judgment debtor. But such has been the practical construction which has been given to the statutes on this subject for more than a century; and it is the only mode in which a judgment can be docketed so as to enable a subsequent purchaser, or incumbrancer, by a search in the clerk's office, to ascertain whether there is an existing lien, by judgment, upon the real estate of the judgment debtor. In the present case, therefore, the docketing of Naylor's judgment under the letter P, which was the initial letter of the christian name instead of the surname of Palmer Sumner, the judgment debtor, was not even a substantial compliance with the requirements of the statute.

The rights of the parties to the surplus moneys in controversy, were in no wise affected by the order of the superior court, to amend the docket of the respondent's judgment nunc pro tunc. Before that order was made, the mortgaged premises had been sold and conveyed by the master; and the surplus

moneys had been brought into this court.   So that if the superior court had the power, under the act of April, 1844, (*Laws of* 1844, *p.* 92, § 7,) to order a judgment to be docketed nunc pro tunc, so as to give it a priority, as a lien upon real estate, over an intermediate judgment, it could not give a lien upon real estate which had been sold and conveyed, under a decree upon a prior incumbrance, long before that order was made. Besides, the order itself, in substance, provides that the docketing of Naylor's judgment, nunc pro tunc, shall not prejudice the rights of those whose judgments had been duly docketed subsequent to the recovery of his judgment, and before the entry of that order.

The other ground, however, upon which the counsel for the respondent base his claim to an equitable priority, in reference to the surplus proceeds of the mortgaged premises in this case, appears to be sufficient to sustain the order appealed from.  It is a settled principle of the law of partnership, that the partnership effects are to be applied in the first place to the payment of the debts of the firm, and to equalize the claims of the different copartners in relation to the fund.  In other words, the separate estate or interest of a copartner in any of the copartnership property, is only his share, of that part of the copartnership effects, or of the proceeds thereof, which remains, after the debts of the firm, and the demands of his copartners, as such, are satisfied.   And if one of the copartners has paid more than his share of the partnership debts, he has a claim upon the partnership property, which claim in equity is paramount to the claims of the separate creditors of his copartner. (*Taylor* v. *Fields*, 4 *Ves.* 396.   *Ex parte King*, 17 *Idem*, 115.   *Christian* v. *Ellis*, 1 *Grat. Rep.* 396.   *Nicholl* v. *Mumford*, 4 *John. Ch. Rep.* 522.)   In the cases *Smith* v. *Haviland & Field*, and of *Deveau* v. *Fowler*, (2 *Paige's Rep.* 400,) this court held that an assignment, by one of the partners, or by his personal representatives, of his or their interest in the surplus, was not a relinquishment of the equitable claim to have the debts of the firm paid out of the copartnership funds, where the rights of bona fide purchasers were not involved.

---

Buchan *v.* Sumner.

---

In reference to real property, conveyed to the partners for the benefit and use of the firm, or received in payment of debts due to the copartnership, it is perfectly well settled, both here and in England, that the legal title vests in the grantees thereof, as in an ordinary conveyance of real estate. Thus at the common law, if land was purchased with copartnership funds, for partnership purposes, and was conveyed to all the partners, generally, in fee, it would at law create a joint tenancy; so that neither could convey any more than his share of the land during the lives of his copartners. And upon the death of either of the partners, without having severed the joint tenancy by a conveyance, the legal title to the whole of the land would survive to the other copartners. But under the statutes of this state relative to joint tenancies, the several copartners, to whom such a conveyance was made, would become tenants in common of the legal title. And upon the death of either, the undivided portion of the legal title thus vested in the deceased partner, would descend to his heirs at law; without reference to the equitable rights of the several copartners in the land as a part of the property of the firm. The law is the same in England where the conveyance is made to the several copartners *as tenants in common;* or where there is any thing, upon the face of the deed, showing that it was not intended to create a joint tenancy, but only a tenancy in common in the property. And I believe it is not disputed any where, that a bona fide purchaser, or mortgagee, who obtains the legal title to partnership lands, or to an undivided portion thereof, from the person who holds such legal title, and without notice of the equitable rights of others in the property as a part of the funds of the copartnership, is entitled to protection in courts of equity as well as in courts of law. But questions have frequently arisen, both in this country and in England, concerning the equitable rights of the copartners, or their representatives, in such property, as between themselves; and also as between the heirs at law and the personal representatives of a deceased copartner.

Where real estate is purchased with partnership funds, for the use of the firm, and without any intention of withdrawing

the funds from the firm for the use of all or any of the members thereof as individuals, I believe it has never been doubted in England, that such real estate was, in equity, to be considered and treated as the property of the members of the firm collectively; and as liable to all the equitable rights of the partners as between themselves. And for this purpose the holders of the legal title are considered, in equity, as the mere trustees of those who are beneficially interested in the fund; not only during the existence of the copartnership, but also upon the dissolution thereof by the death of some of the copartners or otherwise. (*Lake* v. *Craddock*, 3 *Peere Wms.* 158. *Smith* v. *Smith*, 5 *Ves.* 189. *Watson on Part.* 72. *Gow on Part.* 48, 288. *Story on Part.* 128, § 93. 1 *Story's Eq.* § 674.)

Another question has arisen, in relation to real estate as copartnership property, respecting which there has been a great conflict of opinion in England. That question is, whether real estate of a copartnership, upon the death of one of the copartners, and after the debts have been paid and the equities adjusted between the several members of the firm, belongs, in equity, to the executor or administrator of the decedent, as a part of his personal property; or whether the beneficial interest, as well as the legal title, in the decedent's share of such real estate, descends to the heirs at law. In the case of *Thornton* v. *Dixon*, (3 *Bro. Ch. Ca.* 199,) Lord Thurlow, upon the first argument, inclined to think the interest of the deceased partner must, in equity, be considered as a part of his personal property; and that it should go to his personal representatives. But upon a second argument, he changed his opinion, and decided that, in the absence of any agreement that the land should be converted into personalty at the termination of the partnership, it belonged to the heir, as real estate. That decision was followed by Sir William Grant in *Bell* v. *Phyn*, (7 *Ves.* 453,) and in *Balmain* v. *Shore*, (9 *Idem*, 500.) But these decisions were subsequently overruled by Lord Eldon in *Townsend* v. *Devaynes*, (*Mont. on Part. App.* 97.) And it may now be considered as the general rule in England, that real estate

belonging to the firm, unless there is something in the partnership articles to give it a different direction, is to be considered, in equity, as personal property; and that it goes to the personal representative of the deceased partner who was beneficially interested therein. (*Sellcrigg* v. *Davies*, 2 *Dow's P. C.* 231. *Phillips* v. *Phillips*, 1 *Myl. & Keen*, 649. *Broom* v. *Broom*, 3 *Idem*, 443. *Houghton* v. *Houghton*, 11 *Sim. Rep.* 491. *Morris* v. *Kearsley*, 2 *Young & Coll. Rep.* 139.) In a very recent case, however, Lord Langdale appears to have departed from this general rule, where the copartners, after the termination of the copartnership, continued to treat the property, which had been purchased by the firm, as real estate, by renting it to a new firm. He there held, that upon the death of one of the members of the old firm, his beneficial interest in the real estate, as such copartner, was, in equity, to be considered as real estate; and that it belonged to his heir at law (*Rowley* v. *Adams*, 7 *Beav. Ch. Rep.* 548. *See also Randall* v. *Randall*, 7 *Sim. Rep.* 271.) And in a still later case, the court of common pleas, in England, decided that real estate conveyed to trustees for the use of a copartnership, was to be considered as giving the several members of the firm an equitable freehold therein, to the extent of their respective shares in the copartnership stock, so as to entitle them to vote as freeholders; although the trust deed declared, in express terms, that the lands conveyed thereby should be considered in the nature of personal, and not as real estate. (*Baxter* v. *Newman*, 1 *Lutw. Regist. Cas.* 287.) But in that case, Chief Justice Tindall, who delivered the opinion of the court, distinctly recognizes the principle that a court of equity will deal with real property as if it was personalty, so far as is necessary to carry the intention of the copartners into execution.

The American decisions in relation to real estate purchased with partnership funds, or for the use of the firm, are various, and conflicting. But I think they may generally be considered as establishing these two principles: *First*, that such real estate is, in equity, chargeable with the debts of the copartnership, and with any balance which may be due from one copart-

ner to another upon the winding up of the affairs of the firm. *Secondly*, that, as between the personal representatives and the heirs at law of a deceased partner, his share of the surplus of the real estate of the copartnership, which remains after paying the debts of the copartnership, and adjusting all the equitable claims of the different members of the firm as between themselves, is considered and treated as real estate.

In *Smith* v. *Jones*, (3 *Fairf. Rep.* 337,) Judge Emery recognizes the principle that real estate, purchased with copartnership funds, is in equity to be treated as part of the effects of the firm. In a subsequent case, *Blake* v. *Nulter*, (1 *Apple. Rep.* 19,) Weston, C. J. doubted whether this principle was not to be controlled, in the state of Maine, by statute. But in *Dudley* v. *Littlefield*, (8 *Shep. Rep.* 422,) it was held that there might be a copartnership in the purchase and sale of real estate; although different rules prevailed in that case, in relation to the transfer of the title, from those which were applicable to personal property owned by the firm.

In *Pitts* v. *Waugh*, (4 *Mass. Rep.* 424,) the supreme court of Massachusetts decided that a man could not be charged as a dormant partner in a firm for the buying and selling of land; and that the law merchant did not extend to such a case. In the subsequent case of *Goodwin* v. *Richardson*, (11 *Idem*, 469,) the same court decided that where lands were mortgaged to a mercantile firm, for the security of a debt, and the copartners afterwards entered for non-payment, so that the equity of redemption was extinguished according to the law of that state, the moiety of the land, upon the death of one of the copartners, descended to his heirs at law; and that the surviving partner had no claim to payment out of the proceeds of that moiety of the land, in preference to the individual creditors of the deceased partner. But the decision in that case may have been controlled by a local statute giving the creditors of the copartnership the same rights against the separate property of the decedent as his individual creditors had.

The case of *Hoxie* v. *Carr*, (1 *Sum. Rep.* 104,) arose in the state of Rhode Island, and came before the late Mr. Justice

Story, in the circuit court of the United States, upon a bill in equity. And his honor decided that real estate of the copartnership, purchased with partnership funds, was in equity to be deemed the property of the partnership, without reference to the legal title, whether vested in all or any of the members of the firm; and that it must be considered and treated as personal estate, as regarded the payment of the partnership debts, and the adjustment of partnership rights, upon the winding up of the concern. He also said, in that case, that *Goodwin* v. *Richardson,* in the state of Massachusetts, turned upon a mere point of local law, under a local statute, and did not dispose of the equities between the parties resulting from general principles. He held, therefore, that the equitable lien of one of the partners, upon the real estate, for the adjustment of the balance due to him from the firm, and for the payment of the copartnership debts, was entitled to a preference over the legal title which the defendant had acquired, from the other copartner, with notice of such equitable lien. And the decision in the case of *Sigourney* v. *Munn,* in the adjoining state of Connecticut, (7 *Conn. Rep.* 11,) is in accordance with the principles stated by Judge Story in the case last referred to.

The case of *Coles* v. *Coles,* (15 *John. Rep.* 159,) in the supreme court of this state, appears from the marginal note, to be in conflict with this principle; but upon examining the report itself, it will be seen that there was nothing in that case to show when the property was purchased, or that it was purchased with partnership funds. All that appeared was that the partnership business had been carried on there, and that the two individuals composing the firm sold the premises, and the defendant received the whole of the proceeds of the sale, after paying off the incumbrance upon the lot. The court very properly considered it as real estate, held by the two copartners as tenants in common, and not as a part of the partnership property; and allowed the plaintiff to recover the one half of the surplus proceeds of the sale, in an action for money had and received for the use of the intestate. In *Smith* v. *Jackson,* (2 *Edw. Ch. Rep.* 28,) where real estate had been purchased

with the funds of a copartnership which had become insol‹ vent, the late vice chancellor McCoun decreed the surplus proceeds of the property, on the foreclosure of a mortgage thereon, to be paid to the creditors of the firm ; as a part of the copartnership property.

In the case of *Smith* v. *Wood,* (*Saxt. Rep.* 76,) the chancellor of New-Jersey decided that where property had been purchased with the copartnership funds, but had been treated by the members of the firm as real estate, for a long time after the dissolution of the copartnership, and each of them had sold his undivided half of the land separately, and where the rights of creditors of the firm were not concerned, that the proceeds of the sale must be considered as the proceeds of real estate, held by the copartners merely as tenants in common. But he intentionally declined to express any opinion upon the question as to how the real estate, in that case, might have been considered in equity, as between the partners themselves, during the existence of the copartnership ; or afterwards, as between the partners and creditors. In the subsequent case of *Baldwin* v. *Johnson,* (*Idem,* 441,) that court recognized and acted upon the principle that real estate purchased with partnership funds is, in equity, the property of the partnership, although the legal title is taken in the name of one of the members of the firm only.

In *McDermot* v. *Lawrence,* (7 *Serg. & Rawle's Rep.* 438,) where land was leased in fee to the members of a copartnership, and buildings erected thereon by them out of the partnership funds, and where one of the lessees, some years after the dissolution of the partnership, and after the premises had ceased to be used for partnership purposes, mortgaged his third of the premises to a bona fide mortgagee, who had no notice of the equities claimed by the other partners, the supreme court of Pennsylvania decided that, as between the mortgagee and partnership creditors, the mortgaged premises were to be considered as real estate ; and that the mortgagee was entitled to priority in payment out of the proceeds of the undivided third mortgaged to him. There is nothing in this decision inconsistent with the

settled rule of equity in England on the subject of the real estate belonging to a copartnership. For it is admitted that a bona fide purchaser, or mortgagee, who obtains the legal title to the property without notice of the equitable claims of other members of the firm, is entitled to protection. But in a more recent case, the supreme court of Pennsylvania has gone much further. For in *Hale* v. *Henrie*, (2 *Watts' Rep*. 144,) that court decided that it was not competent to show by parol, to affect the title or possession, that land deeded to two persons as tenants in common, was purchased and paid for by them as partners, and was, in fact, partnership property; but that when partners intended to bring real estate into a partnership stock, their intention must be manifested by deed, or writing, placed on record.

In *Forde* v. *Herron*, (4 *Munf. Rep*. 316,) the court of appeals in Virginia recognized the principle that real estate, purchased with the funds of a copartnership, might in equity be liable to the equitable liens of the individual partners, in preference to the separate debts of those partners in whom the legal title was vested. But they held that a bona fide mortgagee was protected, under the circumstances of that case. That court again recognized the principle in *Deloney* v. *Hutcheson*, (2 *Rand. Rep*. 183.) But a majority of the judges thought there was nothing to show that the property in question was purchased with the funds of the firm, or as partnership property. There is nothing in either of those decisions, therefore, which is inconsistent with the decision in a previous case, of *Edgar* v. *Donnally*, (2 *Munf. Rep*. 387.)

In the case of *Baird* v. *Baird*, (1 *Dev. & Bat. Eq. Ca*. 524,) the supreme court of North Carolina decided that lands purchased with partnership funds, belonged to the copartnership; and could not be partitioned, until the accounts of the copartners were taken, and the interest of each partner therein ascertained. And in the case of *Richardson* v. *Wyatt*, (2 *Dess. Eq. Rep*. 471,) the court of chancery in South Carolina decided that real property, thus purchased, belonged to the firm; and the widow of a copartner who had died, largely indebted to the

Buchan *v.* Sumner.

ใ่ .ภ, was not entitled to dower in his legal estate in such prop-er.'y. And in *Winslow* v. *Chiffelle,* (*Harp. Eq. Rep.* 25,) the court of appeals in that state held that the real estate of the partnership was chargeable with the debts of the firm, in prefer-ence to the separate debts of individual members.

In *McAllister* v. *Montgomery,* (3 *Hay. Rep.* 94,) the court of errors and appeals, in Tennessee, decided that under the statute of that state, relative to joint tenancies for the purpose of trade and commerce, real property belonging to the copart-nership went to the surviving partner, for the purpose of paying the debts of the firm ; and that the heirs at law of the deceased partner were entitled to the residue of his share, after the part-nership concerns were adjusted, and the debts of the firm paid. And in a recent case the present supreme court of that state decided that real estate, purchased by a partnership for the use, or on account of the firm, was in equity to be deemed partner-ship property ; no matter in whose name the purchase was made, or whether the legal title was in one or all of the copart-ners. (*Hunt* v. *Benson,* 2 *Humph. Rep.* 459.) It was also held in that case, that if the property was paid for with the funds of the firm, it was prima. facie evidence, and decisive in the absence of countervailing circumstances, that it was intend-ed to be held as partnership property.

In *Greene* v. *The Surviving Partners of Greene & Co.,* (1 *Ham. Ohio Rep.* 535,) the articles of copartnership provided that, upon the dissolution of the firm, the property of the con-cern should be sold, and the proceeds applied in the first place to the payment of the debts due from the partnership. And the supreme court of Ohio decided, in that case, that the real estate of the firm, although the legal title thereof was in all the copartners, as tenants in common, was subject to the equitable liens of the individual partners for the adjustment of the affairs of the firm. And one of the partners having died indebted to the firm, in an amount greater than the value of his share, it was held that his widow was not entitled to dower in the prop-erty. The case of *Greene* v. *Graham,* (5 *Idem,* 264,) is not in conflict with that decision. For it was only decided, in the

latter case, that a person cláiming under a sale made by the representative of the deceased partner, was prima facie entitled to partition ; in the absence of all proof that the one half of the property did not in equity belong to the deceased partner.

In the case of the heirs of *Pugh* v. *Currie*, (5 *Alab. Rep. N. S.* 446,) one of the members of the firm purchased real estate with the copartnership funds, with the intention of improving and selling such lands for the use and benefit of the firm. He afterwards died insolvent, leaving the firm deeply indebted. Upon that state of facts the supreme court of Alabama decided that, in equity, the land belonged to the firm ; and that the heirs at law of such deceased partner held the title in trust for the surviving partners, to pay the debts of the firm. So in *Woolridge* v. *Wilkin*, (3 *How. Miss. Rep.* 360,) the court of appeals of Mississippi held, that lands purchased with partnership funds, and which had been subsequently sold to pay partnership debts, were in equity a part of the joint stock of the firm, and that the widow of one of the partners, who did not join in the conveyance, and whose husband died subsequent to the sale, was not entitled to dower in the undivided share of the premises of which her husband once held the legal title, as a tenant in common with his copartners. And in the case of *Thayer* v. *Lane*, ( *Walk. Ch. Rep.* 200,) Chancellor Manning, of Michigan, decided that, as between the partners themselves, real estate purchased with partnership funds was in equity partnership property, and that as between them it should be divided as such, upon the dissolution of the firm ; unless, at the time of the purchase, it was understood to be an individual and not a partnership transaction.

Although a court of equity considers and treats real property as a part of the stock of the firm, it leaves the legal title undisturbed, except so far as is necessary to protect the equitable rights of the several members of the firm therein. And in the present case, Sumner was the owner of the one half of the mortgaged premises, subject to the equitable lien of his copartner thereon, for one half of the debts which the latter was obliged to pay, subsequent to the dissolution of the firm ; the

personal property of the copartnership having been disposed of at the time of such dissolution. That prior equitable lien, how-ever, was paramount to the subsequent legal lien of the ap-pellant, by virtue of his judgment. For the separate creditors of the individual partners have no equitable right, to any part of the partnership property, until the debts of the firm are provided for, and the rights of the partners as between themselves fully protected. (*Nicholl* v. *Mumford*, 4 *John. Ch. Rep.* 522. *Christian* v. *Ellis*, 1 *Gratt.* 396. *Cammack* v. *Johnson*, 1 *Green's Ch. Rep.* 163. *Pierce* v. *Tierman*, 10 *Gill & John.* 253.)

The lien which the appellant, in this case, had obtained, upon the legal title of his judgment debtor, in one half of the equity of redemption in the mortgaged premises, by the prior docketing of his judgment, must therefore yield to the superior as well as prior equitable claim of Naylor, upon the same equity of redemption as partnership property. For the general lien of a judgment creditor, upon the lands of his debtor, is subject to all equities which existed against such lands, in favor of third persons, at the time of the recovery of the judgment. And the court of chancery will so control the legal lien, of the judgment creditor, as to restrict it to the actual interest of the judgment debtor in the property; so as fully to protect the rights of those who have a prior equitable interest in such property, or in the proceeds thereof. (*White* v. *Carpenter*, 2 *Paige's Rep.* 217. *Kierstead* v. *Avery*, 4 *Idem*, 9. *Matter of Howe*, 1 *Idem*, 125.)

The respondent, therefore, is entitled to the whole surplus proceeds which are in litigation here. And the decretal order of the vice chancellor must be affirmed with costs.