## WILCOX vs. BATES and others.

EVIDENCE: (1.) *Parol evidence admissible to show that a deed absolute on its face was a mortgage.* (2.) *Evidence estimated and criticised.* (4.) *When plaintiff's declarations admissible in his own behalf.*
AGENCY: (3.) *Agent's knowledge of facts binding on principal.*

1. It is the settled law of this state, that parol proof is admissible to show a deed absolute on its face to be a mortgage.
2. The evidence in this case *held* sufficient to show that the defendants, in acquiring the legal title to plaintiff's lands, acted under an arrangement by which plaintiff might re-acquire the title on repayment of the moneys advanced, etc.

Wis. xxvi—59

3. If one of the defendants advanced moneys of his wife under this arrangement, his knowledge of the facts, while acting as her agent, binds her.
4. Defendants having purchased lands belonging to plaintiff at a sale thereof on foreclosure of a mortgage, plaintiff's declarations at and before the sale are admissible evidence, as part of the *res gestæ*, to show that the purchase was made for his benefit, and in pursuance of an arrangement with him.

APPEAL from the Circuit Court for *Rock* County.

Action against *Allen C. Bates* and *George Harvey and their wives*, to redeem two hundred acres of land, consisting of the S. E. ¼ of sec. 12, and the S. E. ¼ of the S. E. ¼ of sec. 13, in the vicinity of the city of Janesville. The complaint charges that said *Bates* and *Harvey* acquired the legal title under an arrangement by which they were to hold the same as security for moneys advanced by them to pay the plaintiff's debts, and that they had conveyed a portion of said lands to *Mrs. Bates* and *Mrs. Harvey* without any valuable consideration, etc. The plaintiff appealed from a judgment in favor of the defendants.*

*I. C. Sloan*, for the appellant.

*John Winans* and *Bennett & Norcross*, for the respondent.

PAINE, J. Notwithstanding what was said in the opinion in *Rasdall's Adm'rs v. Rasdall*, 9 Wis. 379, as to the admissibility of parol evidence to prove an absolute deed a mortgage, upon principle, it has since been frequently held by this court that the admissiblity of such evidence had been so long established by authority as to have become a rule of property, which ought not to be changed by the judicial department.

This being so, the merits of this case depend almost entirely upon the question of fact, whether the title to the plaintiff's property was taken by *Bates*, by means of the various proceedings recounted in the evidence,

---

* The pleadings and evidence in this case were very voluminous, and a statement of them would occupy more space than the importance of the case to the profession would justify. The reporter has, therefore, confined himself to the above very brief indication of the character of the action; but has published the opinion of Mr. Justice PAINE in full.

in pursuance of an agreement that his advances were to be made as a loan, and that he was to hold the title as a security merely, as alleged in the complaint.

After a careful consideration of the testimony, we are unable to avoid a clear conviction that such an agreement was made, and that the title was so taken in pursuance of it. Independent of the testimony of the plaintiff himself, who swears positively to the facts, there is the evidence of several witnesses proving them in the most clear and satisfactory manner. The testimony of Mr. Pierce alone is so significant, that it can leave no doubt upon the mind that these facts are true. Although somewhat advanced in years, his statements are clear, intelligent, and so weighty in their inherent character, as to carry conviction along with them.

He was the owner of certain tax certificates, and certificates of sale upon judgments, upon some of the lands of *Wilcox*. *Bates*, not long after the time when *Wilcox* claims this arrangement was made between them, applied to Pierce to purchase the certificates which he owned. Pierce was willing to favor *Wilcox*, and to part with the certificates to him, or for his benefit, at the rate of fifty cents on the dollar, as to a considerable portion of the amount for which he had a lien on the land, and for which the latter was good security. He accordingly enquired of *Bates* whether he wanted to purchase as a speculation, or whether he wanted them for *Wilcox*. The matter, not being consummated at the first interview, was subsequently renewed; and then *Bates* intimated to Pierce that he wanted to buy for the benefit of *Wilcox*. Still Pierce, with careful precaution that his friendly intentions toward *Wilcox* should not be defeated, took pains to see *Wilcox* himself, informed him of the negotiations with *Bates*, and of the terms on which he had offered the certificates to *Bates* for *Wilcox's* benefit; and only made the transfer after *Wilcox* had expressed his willingness that it should be

done, and with the express understanding with *Bates* that it was to be for *Wilcox's* benefit. Now this is not testimony as to a mere casual conversation, as to something in which the witness had no special interest, and which might be liable to the objections ordinarily urged against mere admissions. The witness himself was willing to surrender a valuable interest for the benefit of his friend, and it of course became material for him to ascertain definitely whether the party desiring to procure it was acting for that friend or not. He took pains to ascertain definitely, by seeing both the parties, and only acted himself after obtaining the information in that manner. There is no room, therefore, to assume inattention or misunderstanding on the part of the witness. Not a suggestion was made against his truth. His statements are not denied by *Mr. Bates* with any such positiveness or clearness that they may really be said to be contradicted. And we believe that they were true.

Being true, they show clearly that, in respect to that portion of the property involved, there was some such understanding between *Bates* and *Wilcox* as is claimed by the latter, and that the title was acquired by *Bates* in pursuance of it. And the case, in its whole scope, is of such a character—the relations between the parties were such, there was such an apparent unity of design throughout, and the entire series of transactions were so in harmony with the idea of some such agreement between the parties—that, it having been satisfactorily proved in respect to a part of the property, the mind almost irresistibly adopts at once the conclusion of its existence as to the whole.

Mr. Congar's testimony is also equally clear and satisfactory. He had been the attorney of Mr. Pierce in obtaining the judgments under which the certificates of sale held by Pierce had been issued. *Bates* applied to him for information in respect to the claims that Pierce had against *Wilcox*, and, in the course of the

conversation, stated that he had made an arrangement with *Wilcox*, by which he was to buy up not only those, but other claims against him, and give *Wilcox* time for payment. He further testified that *Bates* and Pierce were subsequently at his office together, and that *Bates* then repeated substantially the same statements, saying that he proposed to purchase, if he could, all the claims against *Wilcox*, and give him time.

The circumstances under which these statements were made, were also of such a character as almost to preclude the probability of mistake. Being in explanation of the business about which *Bates* had applied to the witness for information, they were of such a character as would naturally have attracted the attention of the latter, and impressed themselves upon his memory.

The testimony of Naiden is also very material, and tends strongly in the same direction. He had a judgment of foreclosure against another portion of *Wilcox's* land, and he made an arrangement with *Wilcox*, by which he bid off the land at the foreclosure sale, and conveyed it to *Bates* and *Harvey* on their paying a part, and becoming responsible for the balance of the money due him. His testimony shows that *Wilcox* was himself active in procuring this to be done—a fact in itself exceedingly significant, and only explainable upon the hypothesis of some such arrangement between him and *Bates* as he now claims.

The evidence as to *Wilcox's* declarations to Naiden at the time, was objected to, but was properly admitted. They were a part of the *res gestæ*. The question was, What was the nature and character of that sale to Naiden, and of the transfer of his interest to *Bates* and *Harvey?* Were they the ordinary proceedings on foreclosure sales, conducted altogether *in invitum*, or were they in pursuance of an understanding to which *Wilcox* was a party, and in which he had an interest? In determining this question, the fact that he took an active part in procuring their consummation is, as

already stated, very material; and his declarations made at the time, and in conducting the very negotiations themselves, were admissible for what they were worth, as a part of the transactions. He told Naiden that he had found a man to advance the money, and *Bates* was the man, and the arrangement was consummated accordingly.

Naiden did not have any conversation with *Bates* at all before the sale; but two or three years afterwards he had a conversation in regard to the transaction, in which *Bates* said he might have done better with his money, and that *Wilcox* had not yet said anything about redeeming, thus clearly implying that the advance was, as in the other instance, by way of loan, and that *Wilcox* had the right to redeem. The attempt by cross-examination to show that this conversation related to some other matter, was entirely unsuccessful.

This strong, positive testimony, coming from so many independent sources, is entirely in harmony with the inherent probabilities of the case, which latter are alone almost sufficient to force upon the mind the conviction of the existence of some such arrangement as *Wilcox* claims. For a series of years he and *Bates* were acting in close and friendly concert, in procuring conveyances to *Bates* of the title to all *Wilcox's* property, including claims and incumbrances. These claims were procured in some instances, as we have seen, at a large discount, and the real estate was transferred, as the evidence shows, for sums much less than the real value. *Wilcox* was making no effort in other directions to prevent the loss and sacrifice of his property, but was all the time active in procuring its transfer to *Bates*. Such action is not explainable, according to the motives which ordinarily govern human conduct, upon any other hypothesis than the existence of this agreement.

The subsequent conduct of the parties was also con-

Wilcox vs. Bates and others.

sistent only with the same theory. *Wilcox* claimed the right to redeem the property, or have it back on paying *Bates* his advances with the interest; and *Bates* did not deny this right, and during negotiations on the subject made a statement of the amount of his claims against the property, made up mostly of these items that he had paid in procuring the title. The correctness of his account was not assented to by *Wilcox*, and no settlement was had. And it is not material now to examine as to its correctness. The material fact, so far as relates to the question now under consideration, is, that he entered into such a negotiation, and presented such an account as the basis of a settlement involving a reconveyance of the property to *Wilcox*. Such a thing might have been done, although he had been dealing in all these transactions as a speculator merely for his own benefit. He might still have been willing to resell to his friend, the original owner, upon favorable terms. But we think the fact much more naturally explainable as the dictate of his conscience, in view of the agreement, than as that of his friendship or generosity.

These considerations have produced a conviction in our minds of the existence of the agreement, too strong to be shaken by anything appearing in the evidence for the defense. The remark already made in respect to the lack of positiveness and clearness in the denials by *Bates* of the conversations testified to by Pierce, is applicable to his entire testimony. It seemed difficult for him to bring himself to a clear, distinct denial of some such agreement or understanding as the plaintiff claims. It can serve no necessary or useful purpose to comment in detail upon his testimony. It is certainly liable to the criticism, that it is in many respects exceedingly confused and uncertain, beyond what might naturally be expected from mere failure of memory. He was utterly unable to give any other satisfactory explanation of several of

these transactions.   And when pressed to the wall for some explanation of the consideration of the $2,200.00 chattel mortgage upon *Wilcox's* livery stable property, in a moment, apparently of desperation, he made a candid statement of the real truth, which would seem to relieve us from the necessity of any closer examination of his testimony.   He said: " My recollection of what did take place is, that *every thing that I did do was to befriend Wilcox*, when he was being pressed by executions and other matters, *to save him*."   That statement, wrung from the witness after he had been held for a long time upon the rack of a most acute and rigid cross-examination, during which several discrepancies in his testimony and in his answer had been exposed and substantially admitted by him, fully sustains the entire theory of the plaintiff's case.   He also claims that everything *Bates* did was done to befriend him and to save him, and he only adds, that it was done in pursuance of an understanding between the parties.

We do not consider it necessary or useful to dwell further upon the evidence, or to attempt to point out all the various circumstances tending to support the conclusion at which we have arrived.   It can be of no avail to point out discrepancies between the defendants' testimony and their sworn answers, nor to attempt any explanation of the plaintiff's denials under oath, after these conveyances to *Bates*, that he had any interest in the property.   It would not be altogether unnatural for an unlearned man so situated, to suppose that he had no legal interest left; and he may have attempted to reconcile such an oath with his conscience, by construing his oath to relate strictly to his legal interest.   But whether or not he even made any such attempt, or whether the fact is capable of any explanation, other than that of intentional dishonesty, it constitutes no reason why his attorney and confidential adviser—for we are satisfied from the evi-

dence that *Bates* was both—should retain his property without redemption, in violation of an agreement satisfactorily proved by testimony wholly independent of the plaintiff's.

We are also satisfied, from the whole evidence, that *Harvey* was a mere partner with *Bates* in the matter, and fully cognizant of the arrangement in pursuance of which he became the part owner of this property. And if he used the separate money of his wife, he acting as her agent, his knowledge of the arrangement was binding upon her, and makes the interest acquired that of a mortgagee merely.

The judgment must be reversed, and the cause remanded with directions for an accounting between the parties, and that the plaintiff have judgment for the relief demanded in· the complaint, conditioned upon the payment of whatever may be due.

*By the Court.*—So ordered.