MARTIN, by guardian *ad litem*, vs. MORRIS.

*February 5 — March 3, 1885.*

FORECLOSURE OF MORTGAGE: PARTNERSHIP: TRUSTS: QUITCLAIM DEED. *(1) Parties: Notice of land contract. (2) Agreement of purchaser at foreclosure sale to fulfil contract. (3) Conveyance of land to surviving partner. (4) Real estate of firm: Settlement of estate of deceased partner. (5) Rights under quitclaim deed. (6) Findings: Evidence: Accounting.*

1. Actual possession by the vendee under a land contract is notice of his rights to the holder of a prior mortgage; and the foreclosure of the mortgage without making such vendee a party to the action will operate as against him merely as an assignment of the mortgage to the purchaser at the foreclosure sale.

2. The owner of mortgaged premises contracted to sell the same in lots to different persons. The mortgage was foreclosed, and at the foreclosure sale certain parties were allowed by the vendees in the land contracts to bid in the land without opposition in consideration of their parol agreement to recognize and fulfil said land contracts. *Held,* that such agreement was binding and that the purchasers at the foreclosure sale took the land subject to the equitable rights of the vendees in the land contracts.

3. The vendees in one of the land contracts were a firm. The purchasers at the foreclosure sale conveyed the lot to the surviving partner of the firm, so describing him in the deed. The land was paid for out of the assets of the late firm. *Held*, that such surviving partner took the land in trust for the use and benefit of the late firm.

4. As between the personal representatives and the heirs at law of a deceased partner, his share of the surplus of the real estate of the firm which remains after paying the debts of the firm and adjusting the equitable claims of its members as between themselves, is considered as real estate.

5. Apart from the effect of the registry laws, the grantee in a quitclaim deed takes only the title which his grantor had, and is not to be regarded as a *bona fide* purchaser without notice.

6. Findings that the defendant's grantor received a conveyance of the land in question with notice of the plaintiff's rights, and that he did not pay the full value of the land, and as to the amount of the rents and profits for which the defendant is liable as trustee in possession (the account being stated by this court)—are *held* to be sustained by the evidence.

APPEAL from the Circuit Court for *Chippewa* County.

This action was brought to charge the defendant, as trustee of the plaintiff, in respect to an undivided half of lot 2, block 14, in the village (now city) of Chippewa Falls, and for an accounting for the rents and profits thereof. The facts are somewhat involved, but, as they are claimed by the plaintiff to be, are fully and clearly stated in the findings of the circuit judge. Although somewhat lengthy, it is deemed advisable to insert them here in full. They are as follows:

" 1. That at the time of the commencement of this action, *Elgar E. Martin*, above named, was a minor, and that N. W. Wheeler was duly appointed his guardian *ad litem*, for the purpose of this action, and that he consented to act as such.

" 2. That on the 1st day of January, 1852, Hiram S. Allen was the owner in fee simple of lot 4 of section 6, town 28, range 8, in Chippewa county, Wisconsin; that on that day he mortgaged the same to H. L. Dousman, Bernard

Brisbois, and John Thomas, to secure a debt to said Dousman; and that he thereafter duly platted said lot into blocks and lots, as the village of Chippewa Falls.

"3. That August 31, 1858, said Allen conveyed lot 2, block 14, of said village, being the property described in the complaint, to the Chippewa Falls Lumbering Company, and that said company, July 15, 1859, entered into a contract in writing with Pierre Legeau, Albert Robert, and Lenore Boisvert, whereby said company agreed to sell to said Legeau, Robert, and Boisvert said lot 2 for the sum of $300; that about September 1, 1859, Legeau and Robert purchased, paid for, and became the owners of all the rights that said Boisvert had under said contract.

"4. That August 11, 1862, John F. Hall, John Welch, and Ward E. Martin were copartners in business in Chippewa Falls, Wisconsin; that on that day said firm purchased, paid for, and became the owners of all the rights that said Robert had under said contract; that October 10, 1862, said Hall and Martin purchased, paid for, and became the owners of all the interest that said Legeau had under said contract, and thereby said Hall, Martin, and Welch succeeded to all the rights of Legeau and Robert in the property in question; and that said rights so purchased by Welch, Martin, and Hall became part of the firm property of said firm.

"5. That said firm occupied said property as their place of business till May 29, 1864, at which time said Welch sold all his interest in the firm property, including his interest in the property in question, to Hall and Martin; that Martin and Hall continued to occupy said property, and to carry on partnership business thereon, till May 24, 1864; and that on that day said Martin died. [There is evidently a clerical error in the above dates. Welch sold his interest to his copartners May 4, 1864, and Martin died August 26, 1864.]

"6. That said *Edgar E. Martin* was the only child and heir of said Ward E. Martin at the time of his death.

"7. That previous to the sale by Robert and Legeau to Welch, Martin & Co., and while said Legeau and Robert were in possession of and occupying the property in question, the mortgage mentioned was foreclosed; but that said Robert was not made a party to the foreclosure action.

"8. That, after the commencement of foreclosure proceedings, a public meeting was held in said village, of parties who had purchased lots in said village of said Allen and of the Chippewa Falls Lumbering Company; that said Allen was then president of said company, and that he then informed all parties interested that he had made arrangement with the holders of said mortgage whereby all outstanding contracts, including the one herein mentioned, should be recognized, and the parties protected from loss; that judgment was rendered in said action to foreclose said mortgage, and a sale made pursuant to the judgment; that at the sale the sheriff made public proclamation, at the request of Phelps and Corwith, that they would purchase the whole mortgaged property in a body, and then protect the holders of contracts on the lots, including the contract under which Welch, Martin, and Hall held the property in question; and that they, the holders of said contracts, relied on the said undertaking of said Phelps and Corwith to protect them, and the said Phelps and Corwith were on that account and the faith of their said undertaking, allowed by said holders of said contracts to bid off and become the owners of the entire property covered by said mortgage.

"9. That after the death of said Martin, said Hall was appointed administrator of his estate. That in the course of his business of settling up the partnership matter, he settled with Phelps and Corwith as to the rights of the firm under said contract, and paid them the sum of $296, and they conveyed the property in question to said Hall in his capacity as surviving partner of the firm.

"10. That said Hall paid all debts of the firm and all the debts of the deceased, without resorting to the property in question, and retained the same in his capacity as surviving partner till December 3, 1869.

"11. That on that day said Hall conveyed said property to one Thomas Morris, and said Morris, at the time he received said transfer, had notice that plaintiff was entitled to an undivided one-half interest in said property.

"12. That thereafter, and on the 12th day of February, 1873, said Thomas Morris died, and the defendant, as sole legatee of Thomas Morris, succeeded. to all the interests of said Thomas Morris in the property in question, and also, as such legatee, he became possessed of other property to a large amount, and the said defendant has ever since been in the possession of and received and kept the rents and profits of said property. That the whole amount of rents and profits received by defendant, exclusive of repairs, insurance, and taxes, computed by taking the balance between rents and profits and payments for repairs, insurance, and taxes for each year, and adding to such balance interest at seven per cent. per annum, from the end of the year in which said balance accrued, to July 12, 1883, and adding together the yearly balance with such interest, is $6,000. This is bringing the account down to July 1, 1883."

The following are the conclusions of law:

"1. That by deed from Phelps and Corwith to said John F. Hall, said Hall became a trustee for plaintiff as the only heir of Ward E. Martin deceased, of the undivided one-half interest in said property, to wit, lot 2, block 14, of the village of Chippewa Falls, Wisconsin.

"2. That by the deed from John F. Hall to Thomas Morris of said property, he, having at the time notice of plaintiff's rights, became a trustee for plaintiff for one half interest in said property.

" 3. The said defendant, as sole legatee, succeeded to the right of said Thomas Morris, and became vested with the whole title to said property, but as trustee of one half of the same for plaintiff.

" 4. That plaintiff is the owner of the undivided one-half of said property, and that defendant is liable to account to plaintiff for one half of the rents and profits of the same since he became vested with the title thereto, less the disbursements made by him for taxes, insurance, and repairs, with interest at seven per cent. per annum on the balance for each year down to the present time.

" 5. That on a just and true accounting down to July 1, 1883, the said defendant, for such one half the rents and profits and interest, less payments for repairs, insurance, and taxes, is indebted to the plaintiff in the sum of $3,000, which sum plaintiff is entitled to recover from defendant.

" 6. That plaintiff is entitled to judgment in this action that he is the owner of the undivided one-half of lot 2, block 14, of the city of Chippewa Falls; that the same is held in trust for him by the defendant; that plaintiff have and recover of and from the defendant the sum of $3,000 on account of rents and profits received by him as trustee to July 1, 1883, and to recover one half of the rents and profits received since that date, or that may be received, and to recover the costs and disbursements of this action, and to have execution therefor; that defendant convey to plaintiff the undivided one-half interest in fee simple in said property on demand, after notice of the entry of judgment herein; that unless said conveyance is made, and said sum of $3,000, with interest from date of this finding, and the costs of this action, are paid within thirty days after notice of the entry of judgment herein, then that the whole of said property be sold under the supervision of William R. Hoyt, an attorney of this court, who is hereby appointed for that purpose." The remainder of this finding contains directions for the sale

and conveyance of the property, and the disposition of the proceeds thereof, similar to those usually found in judgments of foreclosure.

Judgment was entered for the plaintiff in accordance with the foregoing conclusions of law, and the defendant appeals therefrom.

*Arthur Gough*, attorney, and *L. M. Vilas*, of counsel, for the appellant.

For the respondent there was a brief by *Marshall & Jenkins*, and oral argument by *Mr. Marshall* and *Mr. J. C. Gregory*.

LYON, J. 1. The first question presented by the assignment of errors herein, for consideration, is, Did the conveyance of lot 2, block 14, by Phelps and Corwith to John F. Hall vest in the latter the absolute title to and estate in such lot? The argument on behalf of the appellant is to the effect that because the Dousman mortgage was executed prior to any conveyance of the lot by Allen, the mortgagor, the foreclosure of that mortgage cut off all subsequent interests therein, and Phelps and Corwith, the purchasers at the mortgage sale, took the absolute title by the sheriff's deed, and conveyed the same to Hall. We think this position cannot be maintained. During the foreclosure proceedings Robert and Legeau were in the actual possession of the lot under the contract, which they afterwards assigned to Welch, Martin & Co., and Robert was not made a party to the foreclosure suit. Their possession was notice of their equitable interest in the lot under their contract. Robert's interest, which was an undivided half of the whole equitable estate, was not foreclosed by the judgment in that suit and the sale of the lot pursuant thereto, but remained redeemable, and continued so after the same was transferred to Welch, Martin & Co. As against that interest the foreclosure judgment and sale had no effect other than to assign

the mortgage debt and security to the purchaser at the sale. *Hodson v. Treat,* 7 Wis. 263; *Green v. Dixon,* 9 Wis. 532. See, also, cases cited in head-note to *Hodson v. Treat.*

Another reason why the purchasers at the foreclosure sale did not take the absolute title to the lot, is that they agreed before the sale to recognize the contracts made by Allen and his grantees for the sale of lots, and to protect the holders,— that is to say, to carry out and fulfil said contracts; and, in consideration of such agreement and on the faith of it, the holders of such contracts did not bid upon the mortgaged property, or seek to enhance the price for which it was sold, or take any other steps to protect their interests, but allowed Phelps and Corwith to purchase it at their own price. This, although a parol agreement, was valid and binding upon Phelps and Corwith, and the title to the lot in question, which they took under the sheriff's deed, was subject to the equitable interests of Hall and Martin, and became a mere security for the payment of the money due on the contract under which they held the lot. The judgment of this court in *Wilcox v. Bates,* 26 Wis. 465, fully establishes this last proposition.

Phelps and Corwith carried out this agreement in good faith. On payment to them of the amount due upon the contract they conveyed the lot to Hall after Martin's decease, and to show somewhat the character of the conveyance, they described the grantee therein as "surviving partner of the late firm of Welch, Martin & Co." That the lot became, by virtue of such conveyance, an asset of the late firm of Martin & Hall (which had acquired Welch's interest) does not admit of controversy. It was undoubtedly paid for out of the assets of that firm. Hall scheduled it as one of the assets of the firm, and accounted for Martin's interest in it in the settlement of his accounts as administrator of the estate of Martin.

In view of the foregoing facts, it must be held that Hall

did not take the absolute title in fee to lot 2, under his conveyance from Phelps and Corwith, but that he took the legal title in trust for the use and benefit of the late firm of Martin & Hall.

2. The next question is, Did the proceedings in the county court, in the administration of the estate of Martin, vest in Hall the absolute title to the lot? In making the inventory of the estate of Martin, a balance-sheet of the affairs of the firm of Welch, Martin & Co., made out by Hall, was used. In that balance-sheet the lot in question, fixtures, etc., were included as real estate, and were duly appraised as such. In the inventory of Martin's estate the same property was included as personal property. This inventory was verified by Hall, and bears date January 5, 1865. On December 26, 1865, Hall rendered his final account as administrator, duly verified, to the county court, in which the same property is entered as personal estate. At the same time he rendered to that court a verified report of the sale of the personal property of the estate, in which he states that he had sold the property in controversy to himself at its appraised value.

The contention of the appellant is that the lot is to be regarded as personal property in the hands of Hall; that it was competent for him to become the purchaser thereof at his own sale; and hence that by such purchase he became the absolute owner thereof. The lot was purchased and used for partnership purposes. The store in which the firm of Welch, Martin & Co. carried on business stood upon it. If it is treated as personal property, although we might not be able to hold that Hall could become the purchaser thereof at his own sale, yet it is probably true that the sale and conveyance thereof made by him to the defendant's testator, Thomas Morris, would have vested a good title thereto in the latter, and that the remedy of the plaintiff would not be against such purchaser, but against Hall, to compel him to account for the proceeds of the sale. Hence the question

as to whether the lot in the hands of Hall is to be regarded as personal property or as real estate becomes a vital one in the case. If it is regarded as real estate in the hands of Hall, there is no doubt whatever that his attempted sale thereof to himself is absolutely void. *McCrubb v. Bray,* 36 Wis. 333; R. S. 1858, ch. 94, sec. 62; R. S. 1878, sec. 3914.

In the administration proceedings, the lot in controversy was appraised at $2,098.50, and the appraisal shows that the net interest of Martin in the partnership assets was of the value of $3,574.20. It thus appears that there was no necessity for selling the lot in order to close the affairs of the late firm. It may reasonably be inferred from the testimony that the business of that firm was fully settled, and its debts paid, years before Hall conveyed the property to Thomas Morris,— probably before he rendered his final account as administrator. Certainly the lot was not sold to pay the copartnership debts. While such debts remained unpaid, Hall held the property as surviving partner, not as administrator. The firm debts having all been paid, the question is whether the interest of the deceased partner in the property descended to his heir as real estate, or did it go to the administrator as personal assets. The rule on that subject, which seems to prevail in this country, is stated by Chancellor WALWORTH in *Buchan v. Sumner,* 2 Barb. Ch. 165, as follows: "As between the personal representatives and the heirs at law of a deceased partner, his share of the surplus of the real estate of the copartnership, which remains after paying the debts of the copartnership and adjusting all the equitable claims of the different members of the firm as between themselves, is considered and treated as real estate." Page 201. This rule was sanctioned and applied by this court in *Bird v. Morrison,* 12 Wis. 138 (p. 170); and in *Pierce v. Covert,* 39 Wis. 252. To the same effect is *Shearer v. Shearer,* 98 Mass. 107. See, also, Parsons on Partn. (3d ed.) 376; Tiedeman on Real Prop. § 246, and cases cited.

We are impelled to the conclusion, therefore, that the proceedings in the administration of the estate of the deceased partner, Martin, and the attempted sale by Hall to himself of lot 2, did not vest in him the absolute title to the lot, but that he continued to hold the legal title to an undivided half thereof in trust for the plaintiff as the sole heir of the deceased partner.

3. The next question is, Did the conveyance by Hall to Thomas Morris of lot 2, operate to divest the plaintiff of his interest in the lot? This conveyance is not found in the record, but it was stipulated on the trial that " on December 3, 1869, John Hall and wife gave to Thomas Morris a quitclaim deed of the premises in question; that the consideration mentioned in the deed was $2,500; and that the deed was recorded." Under. this stipulation (the instrument not having been produced), we must infer that the quitclaim deed was in the usual and ordinary form. *Towle v. Ewing,* 23 Wis. 336. Such a deed passes to the grantee only the interest of the grantor in the lands conveyed. Its effect at common law is probably the same as that prescribed by statute to a quitclaim deed in statutory form; that is to say, it has " the effect of a conveyance in fee simple to the grantee, his heirs and assigns, of all right, title, interest, and estate of the grantor, either in possession or expectancy, in and to the premises therein described, and all rights, privileges, and appurtenances thereto belonging." R. S. sec. 2208.

Such being the character of the conveyance from Hall to Thomas Morris, the latter took only the title which the grantor had, and is not in a position to claim protection as a *bona fide* purchaser, without notice of the plaintiff's interest in the lot. *Oliver v. Piatt,* 3 How. 333 (410); *May v. Le Claire,* 11 Wall. 217; *Dickerson v. Colgrove,* 100 U. S. 578. These observations have no reference to the effect of the registry laws.

There is no finding which expresses this view of the con-

veyance by Hall to Thomas Morris. The finding is that Hall conveyed the lot to Morris, and Morris received the conveyance with notice that the plaintiff was entitled to an undivided one-half interest therein. There is sufficient evidence in the record to support such finding. The grantee in a deed is chargeable with constructive notice, at least, of every fact affecting the title which appears in prior conveyances through which he makes his title. *Pringle v. Dunn*, 37 Wis. 449, and cases cited in the opinion by the present chief justice. If the title of Morris rests upon Hall's deed from Phelps and Corwith, it is quite probable that such conveyance, in which Hall is described as the surviving partner of Welch, Martin & Co., was sufficient to put Morris upon inquiry as to whether the heir of Martin had any interest in the lot. If his title rests upon the administration proceedings, he is chargeable with notice that the heir of Martin had an interest therein, for such interest is fully recognized in those proceedings. Moreover, there is much evidence in the record, both direct and circumstantial, tending to show that Morris had actual notice of the plaintiff's interest in the lot before he purchased it. The finding in that behalf cannot be disturbed.

We conclude, therefore, that under Hall's conveyance to Thomas Morris, the latter took the absolute title in fee to an undivided one-half of the lot, and only the legal title to the other undivided one-half thereof, in trust for the plaintiff. It is scarcely necessary to add that the defendant, to whom the lot was devised by Thomas Morris, is in privity with him, and has no greater estate therein than his testator.

4. Something was said in the argument of the hardship and consequent inequity of enforcing the execution of this trust in favor of the plaintiff. It was alleged that Thomas Morris paid Hall $2,500 for the lot, and considerable testimony was given (although there was a conflict of testimony on the subject) tending to show that it was its full value.

There is no specific finding as to how the facts are, but the evidence is entirely satisfactory that Thomas Morris did not pay that sum for the lot. He agreed to do so, but as a part of the consideration he was to pay a mortgage to other parties which Hall placed upon the lot in 1868 to secure his debt for $1,940. Morris purchased that mortgage, but never discharged it of record, and did not cancel the indebtedness of Hall which it was given to secure. After his death, his executor presented the same to the commissioners appointed by the county court to adjust claims against his estate, as a' setoff against a claim for a large amount against the estate presented by Hall, and the same was allowed as such setoff. So, in fact, Thomas Morris paid less than $600 for the property, and there is no pretense that any portion of that sum was applied for the benefit of the plaintiff. Furthermore, we are satisfied by the evidence that the lot was then worth at least $4,000. Under these circumstances it does not seem to us inequitable to enforce this trust.

5. There is another feature of this case, not noticed in the findings, which demands brief consideration. It appears that the plaintiff resided with Hall, and was maintained by him from about the time of his father's death until about 1878,— a period of thirteen or fourteen years. About the year last mentioned, Hall removed to Kansas, and afterwards died there. When he left Wisconsin he was utterly insolvent, and it does not appear that his circumstances ever improved. Plaintiff did not reside with Hall after such removal, and it does not appear that he was afterwards maintained by Hall. Plaintiff was then fifteen or sixteen years of age.

When the administration of the estate of Martin was closed, Hall was appointed guardian of the plaintiff. He thereupon opened an account as such guardian, and charged himself with $1,949.10, which was the net proceeds of the estate of Martin. It does not appear that he ever rendered

any account of his guardianship, or that he ever paid or expended any money to or for the benefit of the plaintiff, other than the maintenance of the plaintiff above mentioned. The proofs satisfy us that he was fully compensated for such maintenance by the rents and profits of plaintiff's property, received by him. Testimony was given on the trial, however, tending to show that after this action was commenced, and only one or two months before the trial, the plaintiff stated to the defendant and certain other persons that Mrs. Hall had sent him from Kansas a draft for the full amount of Hall's indebtedness to him as guardian. The defendant testifies that he said the amount was $3,500. The plaintiff does not deny that he made those statements, but claims that he was under the influence of liquor at the time. He does deny, however, that Mrs. Hall ever sent him any money, and testifies, on the contrary, that he had sent money to her to aid in the support of her family. Of course, if the plaintiff, after he became of age, and with full knowledge of all the facts, received the amount, which, upon a settlement of the guardian's account, was in the hands of Hall and due to him, including the amount which Hall charged to himself, in his account as administrator, for lot 2, the plaintiff would be estopped to assert that he had any interest in the lot. He would thus ratify the sale thereof by Hall, as administrator, to himself.

Considering all the circumstances of the case, we think it is not proved that the plaintiff received any money from Mrs. Hall. All reasonable probabilities are to the contrary. The sum received by Hall as guardian in 1865, and the interest thereon to the time these admissions were made,— a period of eighteen years,— would amount to over $4,000. Even had he received only the principal, some other evidence could have been procured, and doubtless would have been, to show the payment and receipt of the money. This was

not done or attempted on the trial. The claim that such payment was made, must, therefore, be negatived.

Other propositions were discussed on the argument of this appeal, but it is unnecessary to consider them. It is believed that those above determined cover the whole case on the merits. It necessarily follows, from the views herein expressed, that the plaintiff is entitled to judgment enforcing the execution of the alleged trust in respect to the lot in controversy.

6. It only remains to determine whether the trial court correctly fixed the sum to which the plaintiff is entitled for the rents and profits of his property. The same were charged only from the death of Thomas Morris, when the title to the property became vested in the defendant. No account is stated of the rents and profits during the time the property was held by Thomas Morris. The circuit judge probably thought he did not expend any more upon the property than he received for the rents. This opinion is abundantly justified by the evidence. It will be seen by the findings that the defendant was held accountable for rents and profits from January 1, 1873; and that the same were computed upon the basis of his actual receipts and expenditures, which includes taxes and insurance. Simple interest at seven per cent. was also allowed on the balance remaining in his hands each year, from the end of the year until the trial of the action, July 1, 1883. This is undoubtedly the correct basis for the accounting, no fraud or negligence in the management of the property being imputed to the defendant. See *Wilcox v. Bates*, 45 Wis. 138, and cases cited in the opinion by Chief Justice RYAN. No detailed statement of account was made; but the account depends entirely upon the testimony of the defendant, and we have stated it in accordance with such testimony, and have thought best to insert it here. It is as follows:

Martin, by guardian ad litem, vs. Morris.

STATEMENT OF ACCOUNT.

| Year. | Rents. | Expenses. | Balance. | Interest. | Amount. |
|---|---|---|---|---|---|
| 1873............. | 975 00 | 310 00 | 665 00 | 442 23 | 1,107 23 |
| 1874............. | 1,285 00 | 310 00 | 975 00 | 580 12 | 1,555 12 |
| 1875............. | 1,020 00 | 290 00 | 730 00 | 383 25 | 1,113 25 |
| 1876............. | 650 00 | 505 00 | 145 00 | 65 98 | 210 98 |
| 1877............. | 566 63 | 250 00 | 316 68 | 121 92 | 438 60 |
| 1878............. | 441 91 | 275 00 | 166 91 | 52 58 | 219 49 |
| 1879............. | 400 00 | 125 00 | 275 00 | 67 38 | 342 38 |
| 1880............. | 580 00 | 238 96 | 341 04 | 59 68 | 400 72 |
| 1881............. | 750 00 | 321 00 | 429 00 | 45 05 | 474 05 |
| 1882............. | 850 00 | 415 00 | 435 00 | 15 22 | 450 22 |
| To July 1, 1883... | 480 00 | 48 00 | 432 00 | | 432 00 |
| Total........ | 7,998 59 | 3,087 96 | 4,910 63 | 1,833 41 | 6,744 04 |

| | |
|---|---|
| Deduct for repairs, for which no date given................. | 250 00 |
| Net amount of rent and interest thereon..................... | 6,494 04 |
| One half of which is........................................ | 3,247 02 |

We find a statement of the account in the brief of counsel for the plaintiff, which, in the main, is correct. The following corrections have, however, been made therein: A charge of $75 in 1873 for rent to Reckard is stricken out, because the defendant testified he did not collect it. A grading tax for $145, inserted therein as without date, is allowed as of 1876. The rent to John Colle, charged in the account of 1880 at $300, is reduced to $150, on the plaintiff's testimony that the store stood idle a portion of the year. Also, $35 is allowed in that year for the expense of dispossessing a tenant who refused to pay rent. It will thus be seen that the net amount of rents and profits, which was $3,000, allowed by the circuit court, is not too large.

After a careful consideration of the whole case, aided as we have been by the very able arguments of the respective counsel, we find no reasons for disturbing the judgment of the circuit court.

*By the Court.*— The judgment is affirmed.