HORACE H. SMITH *vs.* WALLACE DIPLOCK.

Kennebec.     Opinion January 12, 1929.

*George W. Heselton,*
*Herbert E. Foster,* for complainant.
*McLean, Fogg & Southard,*
*Arthur F. Tiffin,* for defendant.

SITTING: WILSON, C. J., DUNN, DEASY, BARNES, PATTANGALL, JJ.

BARNES, J.  The issue between the parties in this case is as to the character of a transfer of property.

The parties for several years had each owned ninety-nine of the two hundred shares of a corporation engaged in the business of retailing furniture and one-half, in common and undivided, of the store used in the business and the lot on which it stands, in Augusta.

The defendant had been in the business for thirty-four years, and engaged in the real estate business for twenty-five years at time of hearing.

In 1921, the Wallace Diplock Co., a corporation, was formed, Mrs. Diplock and Mrs. Smith each holding a share of stock. Defendant was president and a director; plaintiff, treasurer and a director, and Mrs. Diplock the other director.

In the later years of the business, goods to the value of $75,000 were annually bought and handled in the store and two warehouses, the defendant purchasing and handling the financial side of the

business and the plaintiff selling and delivering over the country-side, operating two motor trucks. Plaintiff is termed the outside man.

Each drew from the business the sum of seventy dollars weekly, denominated in the record, "officer's salaries."

Practically all of the vending was by sales on open account, for not over three thousand dollars worth of accounts receivable are from sales upon lease.

Collecting was slow at the time of the transfer and the corporation then owed heavily — $2,800.00 to banks and individual lenders, evidenced by its notes endorsed by both the parties hereto, and $7,500.00 secured by mortgage on the store and lot. Liabilities at this time for stock in trade, less "reserve for bad debts," totalled about $40,000.00.

Experience in the furniture business on the part of the defendant has been alluded to above. Prior to investing in this corporation the plaintiff had been employed as a stationary engineer in a little village in western Maine.

In the fall of 1926, the financial condition of the corporation was very bad, creditors were pressing their claims insistently, telegrams and night letters demanded payment and threats of suits were received.

About the beginning of the year 1927, defendant began conversations with plaintiff to the effect that money must be put into the treasury.

Plaintiff owed money outside the business, one of his notes, for $1,500.00 being indorsed by defendant. He could furnish no funds but suggested and attempted to interest others to invest in the corporation.

Conferences between the parties were an almost daily occurrence, defendant offering to sell his stock and his interest in the real estate for lessening sums, finally as low as $10,000.00, but plaintiff could not purchase.

Finally, on February 9, 1927, plaintiff transferred to defendant ninety-eight shares of the stock and gave him a quit claim deed of half the store and lot; an agreement on the same date being signed that defendant would save plaintiff harmless from notes aggregating $2,800.00 that had been given to replenish the corpora-

tion treasury, and plaintiff to indemnify defendant against the note for $1,500.00 which the latter had signed with him.

Plaintiff retained one share of the corporate stock, remained in his former position of director and treasurer, and continued in the same employment in the business as formerly, except that plaintiff testifies that on the day after the transfer defendant asked him if he couldn't take less wages until the company could get on its feet, and that he drew thereafter $40.00 instead of $70.00 a week.

The business went on until April 11, 1927, when plaintiff learned that defendant had sold half of the business to newcomers, and at the request of corporation counsel he resigned his office of treasurer.

Thirty days later this bill was brought, and a restraining order issued, after hearing, on May 31st. Hearing was had on the 15th day of March, 1928, and the decree of the Justice was "That the said plaintiff's bill be dismissed with costs to be taxed by the clerk of this court."

The contention of the plaintiff is that the transfer was made on the suggestion of the defendant that if he had all but three shares of the capital stock and a deed of plaintiff's undivided interest in the real estate in his name, for a time, defendant could the more easily raise funds to appease the clamoring of creditors and reestablish the credit of the concern, and that when this was accomplished if plaintiff should tender and offer to pay to defendant one-half such sums as defendant had advanced in aid of the corporation the shares of stock would be returned to plaintiff, and his interest in the real estate reconveyed to him; that to secure plaintiff in a measure defendant assigned to him a $10,000.00 real estate mortgage and the note secured thereby, the same to be returned to defendant when he received one-half his advances.

Plaintiff contends that he carried out his part of the proposals of the defendant; surrendered all but one share of his stock, executed the agreement to pay his note indorsed by the defendant, and signed, executed, and secured the signature of his wife to a deed of the real estate, on which was written, after the description of the property conveyed, at the bottom of the first sheet of the deed, which was written on the form prepared and commonly used for deeds written on a typewriter.

**456**

"It shall here by be understood that this Dead together with 98 shares of the Wallace Diplock Co. is given Wallace Diplock by Horace H. Smith for the soul purpose of raising money to finance the Wallace Diplock Co. For which Wallace Diplock shall sign over a certain Mortgage Dead for $10,-000.00 given him by a Mr. Walsh. It shall also be understood that at any time said Horace Smith shall surrender this Mortgage Dead together with one-half the sum of money required to finance the Wallace Diplock Co. Wallace Diplock shall surrender this Dead together with 98 shares of the Wallace Diplock Co. Other wise Wallace Diplock asumes all claimes which may arise against Said Co. or this property."

This deed plaintiff delivered to the counsel of the corporation, who was at the time as well counsel for both plaintiff and defendant.

Plaintiff further contends that within three weeks of date of transfer, defendant collected substantial sums from accounts receivable; advanced $4,800.00 to the treasury from his own funds, and testifies that he then proposed he would raise and contribute a like sum, that they might "change things back." He says that defendant rejoined "You wait a little while, money is coming in good, it won't be necessary for you to raise any money. He says, we will soon be able to change it back without raising any money"; that later, after he had observed strangers interested in the store and stock, about the 24th of March, defendant approached him and said, "I think these people, these fellows are going to buy the company. Now he says, if they buy, I will take out the amount of money I have put in and I want the Walsh mortgage back, and I will make things right with you on the balance."

Hence plaintiff contends that the purpose of the transfer was in fact but to try an expedient to tide over a period of insufferable indebtedness, which was to be followed, if successful, and if plaintiff met the terms of the agreement, by a reconveyance and redelivery of the property transferred.

He asks that the deed be decreed an equitable mortgage, and that he be allowed to redeem the 98 shares of stock, and proffers the sum that shall be found due from him to equal the amount contributed by defendant.

Defendant testifies that the transfer was in completion of a per-

fected agreement of sale, and denies many of the material allegations of the plaintiff.

As above the presiding justice made no finding of fact, so the Court has not the advantage of a situation wherein it is evident that the statements of witnesses may have seemed reinforced by their appearance, demeanor, character and delivery.

At the close of the presentation of testimony for plaintiff, a motion was made and argued that as a matter of law the bill should be dismissed. This was overruled. Apparently then the Justice decided that the remedy sought was proper and the process conformable with our rules of pleading.

This decision seems to us correct, see, *Reed* v. *Reed*, 75 Me., 264 ; *Stinchfield* v. *Milliken*, 71 Me., 567 ; *Pierce* v. *Robinson*, 13 Cal., 116 ; *Freedman* v. *Avery*, 89 Conn., 439 ; *Deadman* v. *Yantis*, 230 Ill., 243 ; *Campbell* v. *Dearborn*, 109 Mass., 130 ; *McArthur* v. *Robinson et al.*, 104 Mich., 540 ; *Porter* v. *Nelson*, 4 N. H., 130 ; *Rich* v. *Doane*, 35 Vt., 125 ; *Horn* v. *Keteltas*, 46 N. Y., 605 ; *Wilcox* v. *Bates*, 26 Wis., 465.

The finding of the sitting Justice being adverse to the plaintiff, he appeals, and thereby assumes the burden of proving that the evidence will demonstrate that the deed given is in effect an equitable mortgage, and that the capital stock of the corporation was transferred as a pledge or as security and not by way of sale.

It is sometimes said that there is a presumption in favor of the decision of a single Justice upon matters of fact in an equity case.

The rule in this state undoubtedly is that such a decision should not be reversed unless the appellate court is clearly convinced of its incorrectness. *Sposedo* v. *Merriman*, 111 Me., 530.

No matter what the form and phraseology of the written evidence of a conveyance, if the court is satisfied that, at its inception, the agreement of transfer was as security, such conveyance, though in form a deed absolute, is in effect an equitable mortgage.

The agreement may have been oral. *Stinchfield* v. *Milliken*, 71 Me., 567 ; *Reed* v. *Reed*, 75 Me., 269 ; *Jackson* v. *Maxwell*, 113 Me., 366.

This upon the maxim that equity considers that what ought to have been done has been done.

We cannot say, however, there was an agreement to reconvey

unless the degree of proof is practically beyond a reasonable doubt. *Jackson* v. *Maxwell*, supra.

Courts have exhausted the supply of adjectives to express the convincing force of the testimony that is to be adduced before an absolute deed shall be held to be a mortgage. An interesting collation of such expressions of a multitude of courts is found in L. R. A. 1916 B., at page 192.

To have this effect the evidence must be clear, unequivocal and convincing.

We are, however, by no means limited to the wording of the deed. Extrinsic evidence and oral testimony are admissible.

"Where a conveyance is made by a deed absolute in form, the transaction may, in equity, be shown by a written instrument not under seal, or by oral evidence alone, to have been intended as a security for a preëxisting, or for a contemporaneous loan.

Extraneous evidence is admissible to inform the court of every material fact known to the parties when the deed and memorandum were executed. To insist on what was really a mortgage as a sale, is in equity a fraud, which can not be successfully practised under the shelter of any written papers, however precise they may appear to be. The general current of authorities holds that courts incline against conditional sales as they do against forfeitures; and when upon all the circumstances, the mind is uncertain whether a security or a sale was intended, the courts guided by fundamental reasons, will treat it as the former. *Reed* v. *Reed*, supra.

To show the existence of an agreement to reconvey, the acts and declarations of the parties are to be considered, and all inferences that can be logically drawn from facts proven have weight.

"There is another rule that is inflexible, viz. that the character of the transaction, as ascertained by a consideration of all the material facts attending it, is fixed at its inception." *Reed* v. *Reed*, supra; *Bradley* v. *Merrill*, 88 Me., 319; *Libby* v. *Clark*, 88 Me., 36; *Hawes* v. *Williams*, 92 Me., 490; *Hurd* v. *Chase*, 100 Me., 561; *Knapp* v. *Bailey*, 79 Me., 201; *Norton* v. *Berry*, 120 Me., 536.

It is not disputed that defendant endeavored to sell his interest in the business and real estate to the plaintiff.

He would have us believe that on February 9, 1927, the plaintiff sold to him outright. That is his defense. And yet, when testifying

in chief, regarding propositions advanced by him to bring about the transfer, when asked, "Did you ever approach him (meaning the plaintiff) with the proposition that he get out completely, if you put money in the company?" he replied "No I never did."

In weighing the probabilities, as to whether the transfer was a sale or a deposit to secure, it is proper to consider the difference between the value of the property transferred and the consideration given the plaintiff.

It is conceded the consideration was a mortgage for $10,000.00.

What was the value of the property transferred, one-half the fair value of the real estate, above its mortgage, and practically half the worth of the net proceeds of the corporation?

Plaintiff testified the real estate was worth between $15,000.00 and $20,000.00; defendant, between $9,000.00 and $12,000.00

It was mortgaged for $7,500.00. If it were worth not more than $10,500.00, the median between extremes given by defendant, plaintiff's interest amounted to $1,500.00.

Much testimony was given by the parties as to the value of stock and equipment, and defendant introduced as an exhibit a copy of the Corporation Income Tax Return for the year ending October 31, 1926. Here we find the office equipment and delivery truck valued at $2,076.26; approximately $1,000.00 measuring plaintiff's interest therein.

As tending to show the fair value of the other assets, and the amount of the liabilities of the corporation there is much testimony.

Fortunately for a seeker after truth we have the Tax Return of date when defendant testifies assets and liabilities were the same as at date of transfer, introduced by defendant, and a copy of the balance sheet of the corporation prepared for the inspection of the creditor bank within three weeks after that date. The latter exhibit was introduced by the plaintiff and identified by the treasurer of the bank.

We also have an exhibit, speaking as of the same date as the Tax Return. This is a statement of profit and loss for the fiscal year ending October 31, 1926, prepared by a public accountant from an inspection of the books of the corporation.

Defendant testified:

| | | |
|---|---|---|
| Bill receivable | $40,000.00 | |
| Stock in trade | $18,000.00 | $58,000.00 |
| | | |
| Bills payable | . | $32,000.00 |

Value of accounts and stock
above bills payable                                $26,000.00

The exhibit prepared for the bank shows:

| | | |
|---|---|---|
| Accounts receivable | $46,018.68 | |
| Merchandise less office and delivery equipment | 33,000.00 | $79,018.68 |
| | | |
| Accounts payable | | 20,167.86 |
| | | |
| Net worth | . | $58,950.82 |

In the Tax Return we find accounts receivable *less* reserve for bad debts, listed at $47,751.92, so that we are inclined to the belief that defendant's information was unreliable or his recollection faulty. Especially since the statement which he presented to the bank on March 1, 1927, set out a net worth of $60,104.92 above all indebtedness.

It goes without saying that the accounts receivable are subject to appreciable discount, when the cash value is sought.

And the value of the stock in trade may be less than as represented to the bank. But the plaintiff owned nearly half the assets.

The court cannot accept defendant's claim that stock in trade and accounts receivable aggregated only $26,000.00 more than the liabilities of the business.

If stock in trade and accounts receivable are shrunk one third, plaintiff's share of their net worth is      $16,255.63
To this add his interest in the r. e.      1,500.00
One half equipment      1,000.00
                                              $18,755.63
Deducting now half the amount of money borrowed      1,400.00

We have plaintiff's share expressed as      $17,355.63

Plaintiff transferred this interest for a consideration of $10,-000.00, and the fact of such disparity between value of property transferred and consideration is evidence tending to prove the transfer to have been by way of security, as proving the consideration inadequate if advanced as proof of a sale.

"If there is a large margin between the debt or sum advanced, and the value of the land conveyed, that of itself is an assurance of payment stronger than any promise or bond of a necessitous borrower or debtor." *Reed* v. *Reed*, supra; *Campbell* v. *Dearborn*, 109 Mass., 144; *Coyle* v. *Davis*, 116 U. S., 108; *Bridges* v. *Linder*, 60 Iowa, 190; *Pace* v. *Bartles*, 47 N. J. Eq., 170; *Rubo* v. *Bennett*, 85 Ill., App. 473.

The financial embarrassment of the plaintiff is to be considered. So far as his ability to raise funds was concerned, he had none.

When the plight of the concern was brought home to him, it is admitted that he suggested resort to bankruptcy.

This has evidentiary force. *Reed* v. *Reed*, supra, *Reynolds* v. *Blanks*, 78 Ark., 527, 94, S. W., 694; *Pond* v. *Eddy*, 113 Mass., 149; *Skinner* v. *Miller*, 5 Litt. Ky., 84; *Maculay* v. *Smith*, 132 N. Y., 524.

It is argued that the retention of the plaintiff and his wife as stockholders was but a charity and has no force as tending to show a right to redeem. We hold, however, that in the light of all the circumstances this may be regarded with the rest, and the more especially in that plaintiff was retained as treasurer, until defendant resolved to sell to others.

That plaintiff was continued in the conduct of the business would not alone prove a right to redeem, but after the transfer there was discussion between the parties as to his salary. It becomes pertinent. Plaintiff testified thereto as follows:

Q. "How long did this continue before there was any other event came up?

A. The next day Wallace says to me —

Q. The next day after what?

A. That would be the tenth.

Q. The next day you mean after the transaction?

A. Yes, sir: Wallace said to me, now Horace I have given you a note for $10,000.00 which you can collect the interest on; now, don't you think you could take less wages until the company gets

*on its feet?* I says, yes, that is agreeable to me, I can get along on $40.00 a week. He says, all right, you take $40.00 a week and if we change things back before you draw any interest the company will make up your wages and I will see you don't lose any money.

Q. Was that the next day?

A. Yes, sir.

Q. Did it go along any length of time — were you drawing $40.00 a week and continuing there in the company?

A. Yes, I think it ran along until about the tenth of March and the bookkeeper told me there was a Mr. Connor there looking and wanted to buy the business. Wallace didn't say anything to me about him or about it; but about March 24, March 23 or 24, Mr. York and Mr. Connor, the two Mr. Yorks and Mr. Connor came there to the store. Wallace didn't give me any introduction to them: but about the 24th of March as Wallace got back from dinner, he says to me, I think these people, these fellows are going to buy the company. Now, he says if they buy, I will take out the amount of money I have put in and I want the Walsh mortgage back, and I will make things right with you on the balance.

And something came up so that was all there was said at that time."

Plaintiff's contention that he was retained as part owner, director and treasurer is admitted, and his explanation why he accepted less salary is not denied anywhere by defendant or anyone else.

If the transfer was a sale, it seems incredible that plaintiff's entire interest and his wife's share were not purchased, inexplainable why plaintiff remained in the company's employment, at barely above half the salary earned before. And, again, if the transfer was a sale it does not seem that defendant would have been so insistent as the record shows him to have been, to have, for evidence against his business associate a note for the amount of interest on the Walsh note that was due at time of transfer.

It would certainly serve as reliable evidence of a holding for a limited time, or for a definite purpose.

So, under the recognized rules, this Court studies the varied phases of this transaction. It is argued that Hoppe's talks would have been different; that Bagley's recital would not have been the same, had the transaction not been one of sale.

These and perhaps many other particulars of the testimony may appeal to different minds as calling for comment.

There is one circumstance that may have overwhelming probative force, and to some minds determine the question of sale or no sale.

The deed is found to have been mutilated. As was stated above a section of the blank upon which the deed had been written, sufficient in area, if wide margins were left on its four sides to contain the 120 words claimed to have been written there before plaintiff signed it, was cut off before the deed was recorded.

This situation, with testimony that a clause of reconveyance was a part of the cut off section, is a suspicious circumstance, and arrests the attention of the Court.

If the mutilation deprived the deed of any expression carrying a declaration regarding reconveyance, it becomes of great moment to decide when the excision was made, whether before or after delivery. It is admitted that part of text of the deed was cut off.

There is testimony that the excised section of the deed contained expressions that throw light on contention in dispute, that an agreement to reconvey was reached before the transfer—and there is testimony that the excised portion of the text could not be interpreted to apply to an understanding that reconveyance might be had.

There is testimony as to the words of that part of the text excised. There is testimony that the deed was signed, executed and delivered with the paragraph above quoted an integral part thereof ; and there is testimony that the excised portion was cut off before the signing of the deed.

It is claimed by plaintiff and his wife that he brought to her, at noon time of the day of transfer, the quit-claim that is an exhibit in the case; that she read it and made a hurried copy of the last paragraph of its first page, before she signed the deed. This copy, in pencil, is an exhibit in the case. It contains formal errors, and is not in the language employed by some scriveners. But it also contains words evidencing that when the men signed it, the deed proved that a right to a reconveyance, and a right to redeem, were part of the transaction of transfer.

With its errors, we are not concerned. We are much concerned as to whether it was written on the deed at time of signing.

The defendant says no such phraseology was ever part of the deed, nor any words expressing a right of redemption, and that the idea was never discussed by the parties.

In this he is supported by the testimony of the counsel for corporation and for the parties severally.

Both these say that counsel began a writing at the end of the description in the deed of the property conveyed, that was to convey the idea in an exhibit introduced at the hearing.

This exhibit reads:

"1. The said Wallace Diplock hereby assumes and agrees to pay and indemnify and save harmless the said Horace H. Smith from and against all liability on a certain note given jointly by the said Wallace Diplock and Horace H. Smith to Swift & Anderson of said Augusta for about $800.00.

2. The said Wallace Diplock hereby assumes and agrees to pay and to indemnify and save harmless the said Horace H. Smith from and against all liability on a certain note given jointly by the said Wallace Diplock and Horace H. Smith to the Augusta Trust Company for about $2,000.00.

3. The said Horace H. Smith hereby agrees to indemnify and save harmless the said Wallace Diplock from and against all liability upon a certain promissory note for $1,500.00 endorsed by the said Wallace Diplock for the accomodation and benefit of the said Horace H. Smith payable to the Augusta Trust Company and due sometime in July, 1927, and upon any extension or renewals of said note."

There is in this state no presumption that alteration of a written instrument was made before or after its execution. *Gooch* v. *Bryant*, 13 Me., 386; *Crabtree* v. *Clark et al.*, 20 Me., 337; *Belfast Bank* v. *Harriman*, 68 Me., 522.

It must be proved. *Palmer* v. *Blanchard*, 113 Me., 380.

Material alteration, made after delivery, is fraud, and the burden is on the party claiming to gain because of such alteration to explain any apparent material alteration. *Dodge* v. *Haskell*, supra; *Croswell* v. *Labree*, 81 Me., 44.

The writer of the deed testified. He was the only attorney whose counsel was sought in effecting the transfer.

According to his testimony, he was engaged by defendant to make out the papers; plaintiff was present in the attorney's office,

on the morning of the ninth of February, when the deed was in process of preparation, and asked counsel to incorporate in it some memorandum of an agreement to reconvey; that he began writing the substance of the exhibit above quoted, and when he had written two to four lines thereof, defendant entered, noticed what was being written and promptly objected to anything of the sort being made a public record.

Whereupon, counsel says, he took the deed from his machine, and plaintiff held the paper while counsel cut off the section now missing.

Defendant swears to the same act. They make oath to a condition of affairs that, if they are believed, renders it impossible that Mrs. Smith ever saw the deed in other condition than as we have it now, barren of any allusion to an expression of a right to redeem.

Their testimony, if believed, presents both Mr. and Mrs. Smith as willful perjurers, and forces the conclusion that she, with or without the aid of her husband, evolved, at sometime prior to the hearing of May, 1927, the exhibit first herein quoted.

We are not concerned over the question of validity of a deed.

If the substance of what Mrs. Smith testifies she copied from the bottom of the first page of the deed, at noon, on February 9, while her husband was in the cellar, inspecting the furnace, was a part of the deed, and was later cut off by anyone, whatever be the intent, the right of redemption is proven.

If the excision was made by defendant or by anyone for him, grisly fraud at that moment vitiated the proceedings.

It will avail nothing to quote at length the testimony of the husband and wife on the one side, and defendant and his counsel on the other.

But another witness to the content of the excised section was called, a Mrs. Peacock, the wife of a man whom at times defendant took to his lake property to labor thereon.

Her testimony was that, in May, 1927, the same month in which the first hearing was held, defendant while waiting for her husband, in Mrs. Peacock's home, just a few days after she had seen in the newspaper an account of the first hearing, talked over the matter.

She testified defendant said that they had searched for the slip of paper which was cut off from the deed and that when he found it

"there was a very small percentage of the words that were spelled like the one in the original contract."

Upon the entire record it seems unreasonable to doubt that an expression of an agreement to reconvey was a part of the deed when it was delivered. If so the deed is an equitable mortgage, and the shares of stock are subject to redemption.

The case is remanded to the lower court, by whom a master may be appointed, to determine the amount of money contributed to the treasury of the corporation by the defendant between February 9, 1927, and the date of agreement of conveyance to the Yorks and the Mr. Connor named in the bill, or to any or either of them, and upon payment into court of one-half the sum so found, together with delivery to the Court of an assignment of the Walsh mortgage to defendant by plaintiff, decree shall issue in accord with this opinion, with full costs for plaintiff.

*Appeal sustained.*
*Case remanded.*